GEORGE L. ROSADO ET AL. *v.* BRIDGEPORT ROMAN
CATHOLIC DIOCESAN CORPORATION ET AL.
(SC 17807)

Rogers, C. J., and Katz, Palmer, Vertefeuille and Sullivan, Js.

1

Argued December 2, 2008—officially released June 2, 2009

*Philip Allen Lacovara*, pro hac vice, with whom were *Ralph W. Johnson III* and, on the brief, *John B. Farley* and *Joseph T. Sweeney*, for the appellants (named defendant et al.).

*Jonathan M. Albano*, pro hac vice, and *William S. Fish, Jr.*, with whom were *Timothy M. Smyth, Paul Guggina* and, on the brief, *James S. Rollins*, for the appellees (intervenor the New York Times Company et al.).

*Opinion*

KATZ, J. This case returns to this court for the second time, having been remanded to the trial court following our decision in *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 276 Conn. 168, 884 A.2d 981 (2005). The named defendant, the Bridgeport Roman Catholic Diocesan Corporation (diocese), and certain individual

clergymen,[1] appeal from the judgments of the trial court, *Alander, J.*, granting in part the motion of the intervenors,[2] four newspaper publishing companies, to vacate certain orders[3] (sealing orders) limiting disclosure of information obtained in twenty-three cases concerning allegations of sexual abuse by Roman Catholic clergy working under the direction of the diocese that had been settled and withdrawn in 2001.[4]

---

[1] In addition to the Bridgeport Roman Catholic Diocesan Corporation, Reverend Monsignor Thomas Driscoll, as executor of the estate of Bishop Walter Curtis, Reverend Monsignor Andrew T. Cusack, Reverend Monsignor Laurence Bronkiewicz and Bishop Edward Egan, the appellants in the present case, also named as defendants in the original actions were Reverend Raymond Pcolka, Reverend Walter Coleman, Reverend Charles Carr and Reverend Martin Frederici. Seven individuals, currently or previously employed by the diocese, filed pleadings as intervenors under the fictitious names Reverend John Doe I through Reverend John Doe VII for the limited purpose of preventing disclosure of confidential materials in their personnel records. These individuals thereafter opposed the intervening newspapers' motions to vacate the sealing orders. For purposes of convenience, we refer to the named defendants and the seven Reverend John Does collectively as the defendants.

[2] Four newspaper publishing companies, the New York Times Company, the Hartford Courant Company, the Washington Post Company, and the Globe Newspaper Company, filed motions seeking permission to intervene in twenty-three withdrawn cases concerning allegations of sexual abuse by members of the Roman Catholic clergy within the diocese of Bridgeport for the purpose of vacating previously entered sealing orders. In *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 276 Conn. 230–31, this court concluded, inter alia, that the trial court "effectively" had granted those motions, and we remanded the matter to the trial court for a ruling on the motion to vacate those orders.

[3] As we set forth in greater detail in part II of this opinion, the orders at issue both prohibited dissemination of certain information obtained during discovery and sealed certain documents from public access. The original orders were modified at various times to address changes in circumstances. The parties to this appeal, however, agree that the order cited in part II of this opinion essentially reflects the substance of the orders at issue. For convenience, we refer to the orders at issue collectively as the sealing orders.

[4] The twenty-three underlying actions in which the intervenors sought information, all of which were filed initially in the judicial district of Fairfield and subsequently transferred to the judicial district of Waterbury, Complex Litigation Docket, are: *Belleville* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-93-0157371-S; *Carr* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-95-0159118-S; *Didato* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-95-0157370-S; *Doe* v. *Bridgeport*

On appeal, the defendants contend that the trial court improperly denied their motion to disqualify the judicial authority assigned to hear the intervenors' motion to vacate the sealing orders because that trial judge's simultaneous service on a task force concerning public access to the courts while he presided over a case concerning public access to sealed documents created an appearance of impropriety that required disqualification. The defendants also claim that the trial court improperly vacated the sealing orders because, inter alia, it: (1) improperly determined that any documents filed with the court were subject to a presumption of public access, rather than limiting that presumption to "judicial documents," which they allege are pleadings and evidence that are the subject of a judicial ruling on the merits; (2) improperly concluded that the defendants had waived various privileges that would have shielded the documents from public access; and (3)

*Roman Catholic Diocesan Corp.*, Docket No. CV-99-0157369-S; *Doyle* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-94-0159065-S; *Fleetwood* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-95-0156274-S; *Forsberg* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-94-0159066-S; *Harding* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-95-0157368-S; *Knecht* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-96-0157367-S; *Koscelek* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-94-0159067-S; *Kramer* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-95-0157311-S; *Krug* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-93-0157366-S; *Landro* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-94-0159068-S; *McDonough* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-97-0157365-S; *Pace* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-95-0157086-S; *Powers* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-94-0159069-S; *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-93-0157085-S; *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-94-0159070-S; *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-95-0157364-S; *See* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-94-0159071-S; *See* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-93-0157363-S; *Slossar* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-94-0159072-S; and *Slossar* v. *Bridgeport Roman Catholic Diocesan Corp.*, Docket No. CV-94-0159073-S.

applied an incorrect legal standard to determine whether the sealing orders should be modified.[5]

We conclude that the trial court properly denied the defendants' motion to disqualify the judicial authority. We also conclude that, with the exception of a limited number of documents in the court's files that are not subject to disclosure; see footnote 33 of this opinion; the trial court properly concluded that the documents were subject to the presumption of public access. Accordingly, we affirm the judgments of the trial court, except with respect to the fifteen documents that we subsequently identify in part II C of this opinion.

The record reflects the following undisputed facts and rather convoluted procedural history of this case.[6] Beginning in the mid-1990s, twenty-three actions alleging sexual abuse by Roman Catholic clergymen

[5] We note that the claims made in the arguments section of the defendants' brief to this court do not conform to their statement of the issues therein. For example, although the defendants' statement of the issues include a claim that the trial court improperly denied their motion for new protective orders, the defendants did not analyze this claim independently from their claim that the trial court improperly granted the motion to vacate. Accordingly, we consider that claim abandoned and have analyzed the defendants' claims as they have presented them in the argument section of their brief, with some clarification and reordering as necessary for organizational purposes.

[6] We note that the record in this case is voluminous. In addition to the briefs, appendices and designated record that are part of any appeal, the court file in this matter included thirteen boxes containing multiple copies of 12,675 pages of material. The defendants also submitted forty-eight compact discs containing various logs and electronic copies of those 12,675 pages. Although the documents were identified individually by a Bates number, which is an identification scheme to organize large quantities of documents by which each individual page is stamped with a unique identifying number, no index was provided to indicate which Bates number corresponded to a particular document.

We are mindful that the issues in this case are complex and far-reaching. Thus, we have endeavored to be conscientious and methodical in our review to ensure that all issues properly presented have been considered thoroughly. Nevertheless, we remind the parties that it is not the court's responsibility to parse through a voluminous record in search of material that may be relevant to its decision-making process. *State* v. *Montgomery*, 254 Conn. 694, 728, 759 A.2d 995 (2000). Except to the extent that the parties' briefs

employed by the diocese were filed. In the course of pretrial discovery in those cases, upon the defendants' motions, the trial court, *Levin, J.*, issued sealing orders with respect to certain documents and information that had been obtained in discovery on the ground that their disclosure could jeopardize the defendants' right to a fair trial. During the course of litigation in those cases, and in accordance with those orders, the parties submitted numerous documents under seal to the court. On March 12, 2001, prior to the commencement of trial, all of the actions were settled and withdrawn. *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 276 Conn. 173. The sealed documents thereafter remained in the court's possession.

On March 26, 2002, the New York Times Company moved to intervene in the settled cases and filed an emergency motion to vacate the sealing orders. Three other newspaper publishing companies sought to be joined as intervenors. See footnote 2 of this opinion. In May, 2002, the trial court, *McWeeny, J.*, granted the newspapers' request for intervenor status and granted in part the emergency motion to vacate. *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 276 Conn. 184–85. That decision was stayed while the defendants appealed to the Appellate Court, which reversed the trial court's judgment on the ground that the trial court lacked jurisdiction to consider the motions to vacate because the four month period within which a motion to open judgment must be filed pursuant to General Statutes § 52-212a[7] had expired. Id., 191. The

---

specifically referenced material and explicitly pointed this court to that material in the court file and/or provided copies of such material in their appendices, we have limited our review to what was presented to us in the briefs, appendices, and designated record.

[7] General Statutes § 52-212a provides in relevant part: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed. . . ."

intervenors then appealed from the Appellate Court's decision to this court, following our grant of certification to determine: whether the trial court effectively had restored the withdrawn cases to the docket and properly had permitted the newspapers to intervene; whether the Appellate Court properly had concluded that the four month period under § 52-212a deprived the trial court of the authority to restore the withdrawn cases to the docket; and, if not, whether the trial court had abused its discretion in permitting the newspapers to intervene. Id., 192. In a detailed and comprehensive decision, this court first agreed with the Appellate Court that the trial court effectively had restored the cases to the docket and properly had permitted the newspapers to intervene, but disagreed that the four month limitation period had deprived the trial court of jurisdiction over the intervenors' claims. Id. This court concluded that the trial court had not abused its discretion in restoring the withdrawn cases to the docket "for the limited purpose of litigating the issue of whether the protective orders in those cases should be . . . modified" but also concluded, however, "that the trial court . . . improperly had purported to adjudicate the merits of the [intevenors'] claim that the protective orders should be vacated or otherwise modified . . . ." Id., 192–93. We therefore reversed the judgment of the Appellate Court with direction, inter alia, to remand the case to the trial court for a de novo determination, by a different judge, on the merits of the motion to vacate. Id., 231.

On remand, the case was assigned to Judge Alander at the Complex Litigation Docket in the judicial district of Waterbury. The defendants thereafter moved to disqualify Judge Alander, claiming that his participation on the judicial branch's public access task force (task force) coincident with presiding over this case raised an appearance of impropriety. Following a hearing on

the defendants' motion, Judge Alander denied the motion to disqualify himself.

Subsequently, the defendants moved for the entry of a new protective order to bar public access to the documents in question in the event that the trial court modified the previous sealing orders. The trial court held a joint hearing on the intervenors' motion to vacate the sealing orders and the defendants' motion for a new protective order. Thereafter, the trial court granted in large part the intervenors' motion to vacate and denied the defendants' motion to enter a new protective order.

In its memorandum of decision, the trial court examined the public's right of access to court documents and analyzed the interests involved in keeping the documents at issue under seal. The court first concluded that Practice Book § 11-20A (a)[8] sets forth a presumptive right of public access to any document "filed with the court . . . ." Because no Practice Book provision or controlling case law set forth a standard to determine whether sealing orders should be modified, the court adopted one, placing the burden on the moving party

---

[8] Practice Book § 11-20A provides in relevant part: "(a) Except as otherwise provided by law, there shall be a presumption that documents filed with the court shall be available to the public.

"(b) Except as provided in this section and except as otherwise provided by law, including Section 13-5, the judicial authority shall not order that any files, affidavits, documents, or other materials on file with the court or filed in connection with a court proceeding be sealed or their disclosure limited.

"(c) Upon written motion of any party, or upon its own motion, the judicial authority may order that files, affidavits, documents, or other materials on file or lodged with the court or in connection with a court proceeding be sealed or their disclosure limited only if the judicial authority concludes that such order is necessary to preserve an interest which is determined to override the public's interest in viewing such materials. The judicial authority shall first consider reasonable alternatives to any such order and any such order shall be no broader than necessary to protect such overriding interest. An agreement of the parties to seal or limit the disclosure of documents on file with the court or filed in connection with a court proceeding shall not constitute a sufficient basis for the issuance of such an order. . . ."

to show that appropriate grounds exist for modification. The court noted that such grounds would include the following: the initial basis for the sealing orders no longer exists; the sealing orders were granted improvidently; or the interests protected by the sealing orders do not outweigh the public's right of access to the document.

Applying that standard, the trial court found that the intervenors had established appropriate grounds for modification because the initial ground for the sealing orders—ensuring a fair trial—no longer existed because the cases had been withdrawn. Although the defendants had contended that their right to a fair trial still could be compromised because additional actions raising similar claims were pending, the trial court found that, in light of the presumption of public access, continued sealing could not be justified by the existence of pending or potential cases and that less restrictive means existed to protect the defendants' right to a fair trial. Finally, the court rejected the defendants' claim that their reliance on the sealing orders in making disclosures outweighed the public's right of access to the documents, concluding that their reliance on the sealing orders as being permanent was unreasonable given that the express terms of the orders had provided that the orders would be reviewed "not later than the completion of jury selection . . . ."

The trial court also rejected the defendants' claims that various constitutional and statutory privileges protected the information from disclosure. The court concluded that, with the exception of certain statutory medical records privileges, the defendants had waived any claims of privilege when they disclosed the documents to the plaintiffs.[9]

---

[9] The defendants had asserted various privileges related to medical records, pursuant to General Statutes §§ 52-146c, 52-146d et seq., 52-146o, 52-146q and 52-146s, and confidential personnel records, pursuant to General Statutes § 31-128f. The trial court found that various documents protected

The trial court agreed, however, that a limited category of documents were not subject to a presumption of public access and should remain under seal. Specifically, the court concluded that documents submitted to the trial court for an in camera review were not subject to that presumption, noting that a contrary rule would eviscerate the confidentiality basis for conducting in camera reviews. The court further determined that, to the extent that the identity of two of the Reverend John Does who had intervened in the case under fictitious names to protect the privacy of their personnel records; see footnote 1 of this opinion; had not been made public but were contained in a sealed deposition, the names of those two priests were to remain sealed. Accordingly, the court granted the motion to vacate the sealing orders, except with respect to the documents that it had determined to be subject to the medical records privilege, the documents filed with the court for an in camera review, and the names of Reverend John Doe I and Reverend John Doe II. The court also denied the defendants' motion to enter a new protective order, citing the reasons it had set forth in granting the intervenors' motion to vacate the existing order.

The defendants appealed from the trial court's judgment to the Appellate Court, and we transferred the appeal to this court, pursuant to Practice Book § 65-1

by certain medical records privileges required an express waiver that had not been given, and, moreover, the defendant patients whose records were at issue repeatedly had objected to their disclosure. Accordingly, the court held that documents protected by those privileges, which it identified in its memorandum of decision, should remain under seal. The court did find, however, that the public's right of access to the material protected by the statutory personnel record privileges outweighed the individual privacy interests that the privilege protected. On appeal, neither the intervenors nor the defendants have challenged the court's determinations regarding the confidentiality of or privileges pertaining to the medical records and personnel records. Other privileges raised before the trial court and on appeal are set forth in part III of this opinion.

and General Statutes § 51-199 (c). Additional facts and procedural history will be set forth as necessary.

## I

The defendants' first claim is that the trial judge improperly failed to recuse himself in violation of canon 3 (c) (1) of the Code of Judicial Conduct[10] and Practice Book § 1-22 (a).[11] The defendants claim that Judge Alander's *concurrent* participation on the judicial branch's public interest task force and his presiding over the motions addressing whether the public should be given access to previously sealed records gave rise to an appearance of impropriety.[12] The defendants point to the mission of the task force, the lack of task force members from the private sector advocating against public access and the presence of an employee of one of the intervening newspapers on the task force. We conclude that Judge Alander did not abuse his discretion in failing to recuse himself.

## A

The record discloses the following additional relevant facts, which are undisputed. On May 9, 2006, after Judge

---

[10] Canon 3 (c) (1) of the Code of Judicial Conduct provides in relevant part: "A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

"(A) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . ."

[11] Practice Book § 1-22 (a) provides in relevant part: "A judicial authority shall, upon motion of either party or upon its own motion, be disqualified from acting in a matter if such judicial authority is disqualified from acting therein pursuant to Canon 3 (c) of the Code of Judicial Conduct . . . ."

[12] The defendants do not claim that the mere fact of Judge Alander's participation on the task force necessitated his recusal from presiding over this case. On the contrary, the defendants expressly highlight Judge Alander's *simultaneous* service, along with the presence of an employee of one of the intervenors on the task force, as the basis for their claim. Indeed, when reminded expressly at oral argument before this court that one of the panel members hearing the appeal, Justice Palmer, had served on the same task force as Judge Alander, the defendants stated that they were not requesting the recusal of Justice Palmer from hearing this appeal.

Alander had begun presiding over the cases, the judicial branch reported that, one week earlier, Senior Associate Justice David M. Borden had created the task force.[13] According to a press release issued by the judicial branch, Justice Borden explained: "The mission of the task force is to make recommendations for the maximum degree of public access to the courts, *consistent with the needs of the courts in discharging their core*

---

[13] The dissent spends much time discussing a historical recitation of both the litigation surrounding the judicial branch's past practice of classifying sealed case files that resulted in the civil action entitled *Hartford Courant Co.* v. *Pellegrino*, 290 F. Sup. 2d 265 (D. Conn. 2003), and this court's decision limiting public access to certain records in *Clerk of the Superior Court* v. *Freedom of Information Commission*, 278 Conn. 28, 895 A.2d 743 (2006), and suggests that these two cases were largely responsible for the formation of the task force. Because the mission of the task force—"to make recommendations for the maximum degree of public access to the courts, [not merely court records as the dissent suggests] *consistent with the needs of the courts in discharging their core functions of adjudicating and managing cases*"—is undisputed; (emphasis added; internal quotation marks omitted) Press Release, Connecticut Judicial Branch, Judicial Branch's Public Access Task Force Schedules May 25 Meeting (May 9, 2006); the reason for its creation is of little relevance to the issue on appeal. Moreover, the dissent engages in a faulty syllogism in its attempt to connect the controversial supersealed cases with Judge Alander's simultaneous service presiding over the underlying actions in the present case and the task force. The dissent's reasoning would require us to engage in the following syllogism: (A) the judicial branch's position in the federal litigation over the supersealed cases was that the present case raised similar *legal* issues to warrant application of various abstention doctrines; (B) Judge Alander simultaneously presided over the underlying actions in the present case and served on the task force; therefore (C) there is a public perception that Judge Alander was involved in the controversy of supersealed cases. We decline to engage in similarly flawed logic, especially in light of the fact that Judge Alander had no involvement with the supersealing of files, had raised privacy concerns during his tenure on the task force; see footnote 18 of this opinion; and the Court of Appeals for the Second Circuit expressly concluded that the present case was "quite different" from the particular types of files involved in the case before it. *Hartford Courant Co.* v. *Pellegrino*, 380 F.3d 83, 99 (2d Cir. 2004); see id., 87 ("under level 1, which should be used when a case is statutorily sealed by the court, the matter is confidential and no information is to be released or disclosed to the public, including the docket number and case caption, and . . . under level 2, the entire file is sealed but the case caption and docket number may be disclosed" [internal quotation marks omitted]).

*functions of adjudicating and managing cases . . . .*
To that end, this task force is designed to foster con-
structive discussion and concrete solutions . . . ."
(Emphasis added; internal quotation marks omitted.)
Press Release, Connecticut Judicial Branch, Judicial
Branch's Public Access Task Force Schedules May 25
Meeting (May 9, 2006). Associate Justice Richard N.
Palmer was named therein as the chairperson of the
task force. Of the task force's additional seventeen
members, eight were judges, one of whom was Judge
Alander, seven were employees of the print and elec-
tronic media, one of whom was Alaine Griffin, a reporter
for the Hartford Courant, one of the intervenors in the
present case, and two were private practitioners who
were self-described media advocates.

On May 25, 2006, Justice Borden convened the task
force's opening meeting, which was open to the public.
At the outset, he outlined the task force's mission as it
was stated in the press release on the judicial branch's
website. He then instructed the task force members that
they would have to consider "legitimate expectations of
privacy, legitimate concerns for security, and legitimate
needs of confidentiality." Connecticut Judicial Branch,
Public Access Task Force, Remarks of Senior Associate
Justice David M. Borden for the Opening Meeting (May
25, 2006) p. 3. Justice Borden reminded them that they
should be mindful of both sides of the equation and
balance all of the interests involved to serve the larger
public interest. He explicitly instructed members of the
press who served on the task force to "address each
question, not from the vantage point of a judge or a
newsperson or a lawyer representing the media, but
from the vantage point of the public interest . . . ."
Id., p. 6.

Subsequently, speaking at the annual judges meeting
on June 26, 2006, which was open to the public for
the first time, Justice Borden once again set forth the

mission of the task force, as we previously have described. He encouraged the judges to voice "arguments as to why things should not be made more open." Remarks of Senior Associate Justice David M. Borden, Annual Judges Meeting (June 26, 2006) p. 7.

Pursuant to a suggestion made by Justice Palmer at the task force's opening meeting, three subcommittees were created, one of which was the committee on access to court records (committee).[14] Judge Alander was appointed to serve as a cochairperson of that committee. Both of the nongovernment members of the committee were newspaper reporters. One of those reporters was Judge Alander's cochairperson; the other was Griffin.

According to the final published report of the task force, the committee had met nine times between June 6 and August 21, 2006.[15] The report provides: "In the course of these meetings, extensive and vigorous discussions were held on each of the myriad [of] issues encompassed by the broad topic of public access to court records. . . . At the outset of its discussions, the [committee] adopted a set of guiding principles to inform its deliberations." Connecticut Judicial Branch, Public Access Task Force, Final Report (September 15, 2006) pp. 4-2 through 4-3. One such principle was that "all court records are presumptively open and court records should be closed only if there is a compelling reason to do so." Id., p. 4-3. The committee extensively discussed the question of what constituted a "court record," and proposed as one of its recommendations that the definition of that term to which the public has

---

[14] The other two committees were the committee on access to meetings and judicial branch administrative records and the committee on access to judicial proceedings.

[15] It is unclear how many of the nine committee meetings preceded Judge Alander's July 21, 2006 decision granting in large part the intervenors' motion to vacate the sealing orders.

a right of access include: "Any document, information, or other item that is collected, received, or maintained by a court or clerk of [the] court in connection with a judicial proceeding . . . ." Id., p. 4-12. The final report made clear that the task force's proposals were merely recommendations that would require further consideration and action by the executive, legislative and judicial branches before they could become effective. Id., p. 2-1.

The defendants in the present case first raised the issue of Judge Alander's recusal prior to the task force's first meeting in a letter to Judge Alander, dated May 24, 2006, suggesting that he recuse himself from presiding over either the task force or the twenty-three cases against the defendants. In response, Judge Alander issued an order directing the defendants' counsel to Practice Book § 1-23, which sets forth the procedures for filing a motion for disqualification of a judicial authority.[16] In accordance with § 1-23, on June 20, 2006, the defendants filed formal motions to disqualify Judge Alander in the twenty-three cases.

On July 21, 2006, Judge Alander denied the defendants' motions to disqualify himself. In his memorandum of decision, he identified the operative canons from the Code of Judicial Conduct, canon 3 (c) (1); see footnote 10 of this opinion; and canon 4,[17] the legal

---

[16] Practice Book § 1-23 provides: "A motion to disqualify a judicial authority shall be in writing and shall be accompanied by an affidavit setting forth the facts relied upon to show the grounds for disqualification and a certificate of the counsel of record that the motion is made in good faith. The motion shall be filed no less than ten days before the time the case is called for trial or hearing, unless good cause is shown for failure to file within such time."

[17] Canon 4 of the Code of Judicial Conduct provides: "A judge, subject to the proper performance of his or her judicial duties, may engage in the following quasi-judicial activities, if in doing so the judge does not cast doubt on the judge's capacity to decide impartially any issue that may come before him or her:

"(1) A judge may speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice.

standard to be applied and the basis for the defendants' motion. He noted that the defendants were not asserting that he had made any comments or expressed any personal beliefs that concerned the pending litigation or that were contrary to their legal claims in the litigation. Rather, Judge Alander noted, the defendants' motion claimed that "the task force itself [had] been established to advocate the 'maximum' disclosure of information to the public, a position the [defendants claim] is the one held by the [intervenors] in this case, rather than the more limited disclosure [that] protects rights of privacy, which the [defendants assert] is commensurate with its position here."

Judge Alander explained why he had concluded that the defendants' claim was a mischaracterization of the work of the task force as follows: "Justice Borden stated in his opening remarks to the task force that public access must be balanced against other legitimate interests, including legitimate expectations of privacy. The task force's charge and its discussions recognize that it is not, as the [defendants suggest], an either/or proposition, that is, one is either in favor of public access or in favor of the right of privacy. Rather, issues of public access involve a weighing of competing interests, including the interests of public access and privacy, with the result in any instance heavily dependent on

"(2) A judge may appear at a public hearing before an executive or legislative body or official on matters concerning the law, the legal system, and the administration of justice, and may otherwise consult with an executive or legislative body or official, but only on matters concerning the administration of justice.

"(3) A judge may serve as a member, officer, or director of an organization or governmental agency devoted to the improvement of the law, the legal system, or the administration of justice. The judge may assist such an organization in raising funds and may participate in their management and investment, but should not personally participate in public fund raising activities. The judge may make recommendations to public and private fund-granting agencies on projects and programs concerning the law, the legal system, and the administration of justice."

the circumstances. In short, the facts, as presented by the [defendants], do not support the characterization that the task force is an advocacy body for the press." Judge Alander characterized the task force's focus as recommending "what the policy and law *should be* regarding public access to court records." (Emphasis added.)

In contrast, he characterized the issues in the cases pending before him as concerning "what is the *existing* law regarding public access and how does it apply to the facts of these cases." (Emphasis added.) Invoking the notion that a judge "is not, merely by having manifested his opinion on a question of law, legally disqualified from judging in a cause in which that question comes up"; *Wilson* v. *Hinkley*, 1 Kirby (Conn.) 199, 201 (1787); Judge Alander concluded that "service on a commission concerned with improving the legal system and the administration of justice, without more, is not a basis for disqualification."

Finally, Judge Alander concluded that the presence on the task force of a reporter from the Hartford Courant, one of the intervenors in the proceedings, did not require his disqualification. Judge Alander emphasized that the defendants had not established that he actually "had any discussions with the . . . reporter concerning this litigation." Although Judge Alander acknowledged that it was inappropriate for a judge and party to discuss a pending case ex parte, he held that it was "not inappropriate for them to publicly discuss ways to improve the legal system."

B

We begin our analysis with the Code of Judicial Conduct, our rules of practice and the standard under which we review a judicial authority's decision not to recuse himself or herself. Practice Book § 1-22 (a) provides in relevant part: "A judicial authority shall, upon motion

of either party or upon its own motion, be disqualified from acting in a matter if such judicial authority is disqualified from acting therein pursuant to [c]anon 3 (c) of the Code of Judicial Conduct . . . ." Canon 3 (c) (1) of the Code of Judicial Conduct provides in relevant part: "A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned . . . ."

We previously have observed that canon 3 of the Code of Judicial Conduct "requires a judge to disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. The reasonableness standard is an objective one. Thus, the question is not only whether the particular judge is, in fact, impartial but whether a reasonable person would question the judge's impartiality on the basis of all the circumstances." (Internal quotation marks omitted.) *State* v. *Webb*, 238 Conn. 389, 460, 680 A.2d 147 (1996), aff'd after remand, 252 Conn. 128, 750 A.2d 448, cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000); accord *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 527, 911 A.2d 712 (2006); *State* v. *Shabazz*, 246 Conn. 746, 768–69, 719 A.2d 440 (1998), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999); *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 744–46, 444 A.2d 196 (1982). Disqualification is required even when no actual bias has been demonstrated if a judge's impartiality might reasonably be questioned "because the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority." (Internal quotation marks omitted.) *State* v. *Webb*, supra, 460–61; see also R. Flamm, Judicial Disqualification (1996) § 5.4.1, p. 150 ("Judicial decisions rendered under circumstances suggesting bias or favoritism tend to breed skepticism, undermine the integrity of the courts, and generally thwart the principles upon which our jurisprudential

system is based. Since an appearance of bias may be just as damaging to public confidence in the administration of justice as the actual presence of bias, acts or conduct giving the appearance of bias should generally be avoided in the same way as acts or conduct that inexorably bespeak partiality."). Indeed, prevention of the appearance of impropriety is of vital importance to the judiciary and to the judicial process. *Bonelli* v. *Bonelli*, 214 Conn. 14, 19, 570 A.2d 189 (1990). "Members of the judiciary should be acutely aware that any action they take, whether on or off the bench, must be measured against exacting standards of scrutiny to the end that public perception of the integrity of the judiciary will be preserved . . . . There must also be a recognition that any actions undertaken in the public sphere reflect, whether designedly or not, upon the prestige of the judiciary. . . . Judges must assiduously avoid those contacts which might create even the appearance of impropriety." (Internal quotation marks omitted.) *Abington Ltd. Partnership* v. *Heublein*, 246 Conn. 815, 823, 717 A.2d 1232 (1998), aff'd after remand, 257 Conn. 570, 778 A.2d 885 (2001).

An inquiry into the disqualification of a judge requires a sensitive evaluation of all the facts and circumstances in order to determine whether a failure to disqualify the judge was an abuse of sound judicial discretion. Id. In undertaking such an evaluation, we must be mindful of its intrinsic difficulties. "Judges who are asked to recuse themselves are reluctant to impugn their own standards. Likewise, judges sitting in review of others do not like to cast aspersions. Yet drawing all inferences favorable to the honesty and care of the judge whose conduct has been questioned could collapse the appearance of impropriety standard . . . into a demand for proof of actual impropriety." (Internal quotation marks omitted.) *United States* v. *Jordan*, 49 F.3d 152, 157 (5th Cir. 1995).

Turning to the present case, in our judgment, a reasonable person knowing all of the facts would not conclude that Judge Alander's service on the task force jeopardized his impartiality. A trial judge has no affirmative duty to step down from a case merely on the basis of membership on a task force unless the agenda of the task force is inconsistent with the judge's duty to judge impartially. Case law confirms that service on a commission concerned with improving the legal system and the administration of justice, without more, is not a basis for disqualification, even if the subject matter generally relates to the area of the law at issue in the case at hand. See *United States* v. *Glick*, 946 F.2d 335, 337 (4th Cir. 1991) (appellate judge's service as chairman of commission that recommended sentencing guidelines did not necessitate disqualification, upon defendant's motion, in appeal brought by government after trial court departed from sentencing guidelines); *United States* v. *Payne*, 944 F.2d 1458, 1476 (9th Cir. 1991) (trial judge's participation on attorney general's commission on pornography did not necessitate disqualification from case alleging carnal knowledge of female under age of sixteen), cert. denied, 503 U.S. 975, 112 S. Ct. 1598, 118 L. Ed. 2d 313 (1992); *State* v. *Haskins*, 573 N.W.2d 39, 45 (Iowa App. 1997) (trial judge's service on domestic abuse coalition did not require recusal in criminal case alleging domestic violence when coalition's work did not look "to a particular case but to improve the general framework of the system"); *State* v. *Carlson*, 66 Wash. App. 909, 912, 833 P.2d 463 (1992) (trial judge's participation in Kid's Court, program designed to prepare children who were victims of sexual abuse to testify in court, did not warrant disqualification from criminal trial for child rape), review denied, 120 Wash. 2d 1022, 844 P.2d 1017 (1993); see also *State* v. *Montini*, 52 Conn. App. 682, 695–96, 730 A.2d 76 (affirming denial of motion to disqualify

judge who was " 'nationally known advocate for children's rights,' " because he was cofounder of national task force for children's constitutional rights, had served on Connecticut Bar Association crime victims' committee and was chairman of subcommittee on child victims in criminal trial involving sexual assault of child), cert. denied, 249 Conn. 909, 733 A.2d 237 (1999).

Indeed, canon 4 of the Code of Judicial Conduct explicitly authorizes judges to engage in activities to improve the law, the legal system and the administration of justice. See footnote 17 of this opinion. The policy reason underlying the rule that mere participation on a commission dedicated to improving the legal system is insufficient to require disqualification is a compelling one. "To hold otherwise would deprive the citizens of this state of the knowledge and experience which a judge brings to groups designed to improve the legal system." *State* v. *Knowlton,* 123 Idaho 916, 920, 854 P.2d 259 (1993).

Courts likewise have held that a judge's expertise on and exposure to a subject by virtue of service on a commission does not necessitate recusal on a case raising an issue on that same subject. See *Laird* v. *Tatum,* 409 U.S. 824, 835, 93 S. Ct. 7, 34 L. Ed. 2d 50 (1972) (memorandum by Rehnquist, J., on motion to recuse) ("[p]roof that a Justice's mind . . . was a complete tabula rasa in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias"); *Southern Pacific Communications Co.* v. *American Telephone & Telegraph Co.,* 740 F.2d 980, 991 (D.C. Cir. 1984) ("As long as the judge is capable of refining his views . . . and maintaining a completely open mind to decide the facts and apply the applicable law to the facts, personal views on law and policy do not disqualify him from hearing the case. The test may be stated in terms of whether the judge's mind is 'irrevocably closed' on the issues as they arise in the context

of the specific case."), cert. denied, 470 U.S. 1005, 105 S. Ct. 1359, 84 L. Ed. 2d 380 (1985); *Assn. of National Advertisers, Inc.* v. *Federal Trade Commission*, 627 F.2d 1151, 1174 (D.C. Cir. 1979) ("[a]dministrators, and even judges, may hold policy views on questions of law prior to participating in a proceeding"), cert. denied, 447 U.S. 921, 100 S. Ct. 3011, 65 L. Ed. 2d 1113 (1980); see also *United States* v. *Conforte*, 624 F.2d 869, 882 (9th Cir.) ("judge's views on legal issues may not serve as the basis for motions to disqualify"), cert. denied, 449 U.S. 1012, 101 S. Ct. 568, 66 L. Ed. 2d 470 (1980).

The decision by the Second Circuit Court of Appeals in *United States* v. *Pitera*, 5 F.3d 624 (2d Cir. 1993), cert. denied, 510 U.S. 1131, 114 S. Ct. 1103, 127 L. Ed. 2d 415 (1994), is instructive. The defendant in that case had moved for the trial judge's recusal from the United States District Court on the basis of a videotaped lecture she had given to members of the New York/New Jersey region of the Organized Crime Drug Enforcement Task Force. Id., 626. The lecture had been given seven months before the defendant's trial, but after the case had been assigned to the judge. Id. During the lecture, the judge made no reference to the defendant's case, but had included advice to the assembled agents and prosecutors about steps they might take to increase the prospects for conviction in narcotics cases and had urged them to take such steps. Id. The trial judge denied the defendant's recusal motion. Id.

On appeal to the Second Circuit, the defendant focused his attention on the particulars of the trial judge's remarks to the task force, asserting that they were "so pointed in conveying not only techniques for obtaining convictions but also the desirability of such outcomes that [her] impartiality 'might reasonably be questioned,' [pursuant to] 28 U.S.C. § 455 (a) (1988)." Id. In applying the proper standard for recusal—whether a reasonable person, knowing all the facts, would con-

clude that the court's impartiality " 'might reasonably be questioned' "—the Second Circuit concluded that two significant matters provided important context for the challenged aspects of the trial judge's remarks. Id. First, there were parts of the lecture to the task force that "included several emphatic criticisms of prosecutors that would lead a reasonable person not to question, but to have confidence in the [j]udge's impartiality." Id. Second, two months after giving the lecture to the task force, the trial judge had participated in a program for criminal defense lawyers, and the following year, she had participated in the annual retreat of another organization for defense lawyers. Id.

Similarly, in the present case, we conclude that Judge Alander did not abuse his discretion by denying the motion to recuse because a reasonable person with knowledge of all the facts would not determine that his impartiality reasonably might be questioned on the basis of his service on the task force. The task force's enumerated responsibilities expressly included a balance of the public's interest in access to the court system against other legitimate interests, *including legitimate expectations of privacy and confidentiality.* There was no specific agenda with respect to any particular case or even type of case. Indeed, Judge Alander's comments at the opening meeting of the task force suggested that he was concerned about privacy and confidentiality interests.[18] Judge Alander was able to "propose legal reform without compromising his capacity to decide impartially the very issue on which he has spoken or written." E. Thode, Reporter's Notes to Code of Judicial Conduct (1973) p. 74. Mere membership on

[18] It was reported that Judge Alander had suggested, inter alia, that the task force revisit the issue of the automatic unsealing of financial affidavits once their contents had become the basis of a dispute. T. Scheffey, "Judges Annual Meeting Open to Public," 32 Conn. L. Trib. No. 23, May 29, 2006, p. 6.

the task force would not justify a belief that Judge Alander could not be fair.

In light of the case law that we have examined, both from our own precedents and from our sister tribunals, we can conceive of no reason to depart from the rule that membership on a task force concerning a particular legal issue does not justify the disqualification of a judge simply because the judge's service happens to be coincident with his participation in a case dealing with the same issue. It is the responsibility of any judge to evaluate historical facts in light of applicable law. There is no reason to suggest that a judge who is exposed to information concerning potential *future* changes to the law while he is presiding over a case that implicates existing law in that area compromises his ability to be impartial.[19] Judges are not required to abstain from the obligations of daily living or professional development for fear that they should somehow lose their ability to adjudicate a legal issue fairly. Such a requirement not only would render judicial service impossible but also would "deprive the citizens of this state of the knowledge and experience which a judge brings to groups designed to improve the legal system." *State* v. *Knowlton*, supra, 123 Idaho 920. The defendants point to no case law, nor have we found any, that indicates that we should reach a different outcome simply because Judge Alander served on the task force concurrently

---

[19] Although the dissent acknowledges that any rule changes suggested by the task force would have a *prospective* effect once they formally were adopted by the judicial branch, it posits that the appearance of impropriety could arise because Judge Alander could have been called upon to apply and interpret those rules if they became effective by the time that the underlying actions in the present case were litigated. Because any judge assigned to the case would be required to apply those rules if they were then effective, we fail to see how this fact creates an appearance of impropriety. Indeed, judges who serve on committees drafting rules of evidence and rules of practice routinely sit on cases requiring the application and interpretation of those rules.

with his adjudication of the motions at hand, rather than prior to the adjudication. We are not persuaded that Judge Alander's service on the task force would have compromised his ability to be objective simply because it happened to be simultaneous, rather than in the immediate or far past. Accordingly, in light of all of the considerations that the task force was charged with taking into account, we conclude that no reasonable observer would have inferred that Judge Alander could not be impartial.

In essence, the defendants' claim boils down to the proposition that any judge who has served on the task force should recuse himself or herself from a case raising issues relating to sealing court records. "To state [the defendants'] argument is to refute it. The people of this state will be best served by a legal system which encourages judges to enhance their own and others' awareness of legal issues and develop their legal knowledge and skills. Without any support for [their] argument, [the defendants confuse] a judge's efforts to improve the legal system with an assumption of biased advocacy which prevents a judge from exercising the independent judgment and consideration required in the exercise of the judge's professional responsibilities." *State* v. *Carlson,* supra, 66 Wash. App. 913; see also *State* v. *Knowlton,* supra, 123 Idaho 920 ("our citizenry would also suffer if we discouraged our judiciary from heightening their knowledge and awareness of legal issues through participation in groups such as the [task force]").

To the extent that the defendants contend that the presence of a reporter for one of the intervenors could give rise to an appearance of a lack of impartiality because an observer might question whether there had been ex parte communications, we wholly disagree. Canon 3 (a) (4) of the Code of Judicial Conduct provides in relevant part that, with the exception of specifically

enumerated circumstances, "[a] judge shall not initiate, permit or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding . . . ." A reasonable observer would not conclude that Judge Alander would have disregarded this clear mandate simply because he and Griffin, the Hartford Courant reporter, served on the task force. Therefore, Judge Alander did not abuse his discretion in denying the defendants' motion to recuse himself.

## II

The defendants' second claim is that the trial court improperly determined that, because the documents protected by the sealing orders were "filed with the court" in accordance with Practice Book § 11-20A (a), the documents were subject to a presumption of public access for purposes of determining whether to vacate those orders. Specifically, they contend that: (1) the presumption of public access set forth in § 11-20A applies only to judicial documents, which they assert are limited to "pleadings and evidence that are the subject of a judicial ruling on the merits";[20] (2) the presumption favoring public access for any documents that properly could have been considered to be judicial documents should have been balanced against countervailing interests in accordance with the practice followed by the Court of Appeals for the Second Circuit; see footnote 34 of this opinion; that weighed against disclosure; and (3) the presumption of public access was

---

[20] The defendants also suggest that, to the extent that Practice Book § 11-20A allows a broader right of access to public documents than the common-law presumption does, it is inapplicable to the documents at issue because § 11-20A was adopted after the documents were filed and the cases were withdrawn. In essence, the defendants contend that § 11-20A cannot be applied retroactively to them. Because we conclude that § 11-20A merely codified the common law, we need not address this contention.

extinguished with respect to the documents in question once their destruction was authorized under Practice Book §§ 7-10 and 7-21.[21]

In response, the intervenors contend that the trial court properly concluded, in accordance with Practice Book § 11-20A, that all documents filed with the court are presumptively open to the public.[22] They further claim that, even if the presumption is limited to judicial documents, the documents at issue fall into that category because, as this court stated in *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 276 Conn. 217, judicial documents are "documents that have been submitted to the court for its review in the discharge of the court's adjudicatory function," a more expansive definition that encompasses the documents at issue. Finally, they claim that the authorization for destruction of documents under Practice Book §§ 7-10 and 7-21 does not strip the presumption of public access from judicial documents if they still are in the court's possession, as in the present case.

[21] Practice Book § 7-10 provides that "[t]he files in all civil, family and juvenile actions, including summary process and small claims, which, before a final judgment has been rendered on the issues, have been terminated by the filing of a withdrawal or by a judgment of dismissal or nonsuit when the issues have not been resolved on the merits or upon motion by any party or the court, or in which judgment for money damages only has been rendered and a full satisfaction of such judgment has been filed, may be destroyed upon the expiration of one year after such termination or the rendition of such judgment."

Practice Book § 7-21 provides that "[u]nless otherwise ordered by the judicial authority, it is the duty of attorneys and pro se parties, upon the final determination of any civil case, to remove from the courthouse all exhibits that have been entered into evidence, briefs, depositions, and memoranda and, if not so removed, such items may be destroyed by the clerk four months after the final determination of the case, without notice."

[22] We note that the intervenors did not assert any first amendment right of access to the documents in question. We therefore confine our analysis to the presumption of access as provided by the rules of practice in light of the common law.

We conclude that Practice Book § 11-20A codifies the common-law presumption of public access to judicial documents, meaning any document filed with the court that the court reasonably could rely on in support of its adjudicatory function. We conclude that, with the exception of fifteen documents we subsequently identify in part II C of this opinion; see footnote 33 of this opinion; the documents at issue are judicial documents. We further conclude that the trial court was not required to employ the Second Circuit's balancing test when considering whether to grant the motion to vacate the protective orders. Finally, we conclude that Practice Book §§ 7-10 and 7-21 did not terminate the presumption of public access by operation of law because the documents remained in the possession of the court.

The record reveals the following additional undisputed facts and procedural history that are relevant to our resolution of this claim. In 1994, the defendants moved for sealing orders concerning, inter alia, information obtained through deposition testimony and requested that information gained in discovery be restricted from the public. Following a hearing, the trial court, *Levin, J.*, found that the defendants' right to a fair trial would be jeopardized by the public disclosure of such information. Accordingly, the trial court concluded that sealing orders were warranted and issued a protective order that provided the following three restrictions: "1. Until further order of this court, which order shall be made not later than the completion of jury selection, all information, documents and transcripts which the parties may obtain through the depositions of the defendants . . . and Bishop Edward Egan [specifically] shall not be disseminated, shown, disclosed, divulged or transmitted by any one to any person or organization other than the parties to this lawsuit and their respective attorneys and to any investigators and potential expert witnesses retained by the parties to

this lawsuit or their attorneys and stenographic personnel with a need and obligation to see and receive the same . . . .

"2. All such documents and transcripts which the attorneys representing any of the parties believe in good faith may be entitled to protection from disclosure after the completion of jury selection, shall be marked 'CONFIDENTIAL: SUBJECT TO COURT ORDER' and shall be submitted to the court for review and appropriate order before being released from the protection afforded by this order.

"3. Whenever any pleading, document or motion referencing, incorporating or attaching any documents described in paragraph one of this order is filed with the court or delivered to any judge thereof, it shall be filed or delivered under seal pending review by the court or judge and shall be marked by the party filing or delivering same 'CONFIDENTIAL: SUBJECT TO COURT ORDER.' " *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, Superior Court, judicial district of Fairfield, Docket No. CV-93-0300272S (December 8, 1994).

Thereafter, the parties conducted discovery and submitted numerous documents to the court marked "CONFIDENTIAL: SUBJECT TO COURT ORDER" in accordance with the order. These filings included motions or documents submitted in support of motions to be adjudicated by the trial court,[23] as well as documents that were not marked in support of any particular

---

[23] We note that, in some instances, transcripts of entire depositions were filed in support of motions, although the motions or supporting memoranda of law referenced only a few pages of those transcripts. For example, the plaintiffs in the underlying cases filed three volumes of transcripts of deposition testimony from Bishop Walter W. Curtis in support of the plaintiffs' objections to the defendants' motions for summary judgment. The three volumes totaled more than 250 pages, and the plaintiffs' opposition referred to only a fraction of these pages.

motion or other judicial action.[24] In all, approximately 12,675 pages of documents were submitted to the court. In 2001, the parties settled the twenty-three underlying actions, and the cases were withdrawn. In 2002, the four newspaper publishing companies; see footnote 2 of this opinion; filed motions as intervenors to obtain access to those documents. The documents filed with the court in connection with those actions remained in the court's possession.

After the newspaper publishing companies had been granted intervenor status and the cases had been remanded from this court, the trial court, *Alander, J.,* held a hearing on the intervenors' motion to vacate the sealing orders and the defendants' motion for a new protective order. In support of their contentions that the documents at issue were not presumptively open to the public and were, in any event, protected by certain evidentiary privileges, the defendants submitted "judicial documents logs" and "privileges logs" for the court's review. The judicial document logs listed each document in the court's file, identifying the filing date and type of document and whether it was, in the defendants' view, a judicial document and the basis for that characterization.[25] The privileges logs similarly set forth the basis for any privileges that the defendants claimed to apply to the individual documents.

---

[24] For example, on February 5, 1997, the defendants filed a "Notice of Filing Under Seal," which provided: "This is to certify that within the attached envelope, the undersigned defendants are filing the Responsive Affidavit of Reverend Msgr. Laurence R. Bronkiewicz." Nothing in the text of the document indicates whether the affidavit was filed in support of a particular motion or the reason why it was filed.

[25] For example, one entry from a judicial documents log identified a document as the personnel file of an individual priest and provides: "This individual priest's personnel file was submitted to the court (*Levin, J.*) for an in camera inspection in connection with a hearing held on October 3, 1994 regarding the defendants' motions for protective orders. . . . Consequently, these documents were never relied upon for a determination of a dispositive motion addressing the merits of the case. Therefore, this priest's personnel file does not constitute a judicial document."

Following a hearing on the motions, the trial court issued a memorandum of decision granting in part the intervenors' motion to vacate the sealing orders and denying the defendants' motion to issue new protective orders. The court relied exclusively on Practice Book § 11-20A (a), which in the court's view "decreed that the public has a presumptive right of access to any document filed with the court." Because the documents in question had been filed with the court, they presumptively were open to the public pursuant to § 11-20A (a). Consequently, after considering the countervailing interests and any claims of privilege, issues that we address in parts III and IV of this opinion, the court granted in large part the motion to unseal the documents.[26]

As a preliminary matter, we note that the question of what constitutes a document subject to the presumption of public access is a question of law that is squarely presented to this court for the first time. As such, our review is plenary. *Wexler* v. *DeMaio*, 280 Conn. 168, 181, 905 A.2d 1196 (2006) ("[b]ecause the propriety of that finding necessarily depends on the propriety of the trial court's legal conclusion concerning the breadth of disclosure required by [General Statutes] § 13-4 [4], our review is plenary"); *State* v. *Zaporta*, 237 Conn. 58, 64 n.5, 676 A.2d 814 (1996) ("[b]ecause the proper construction of a Practice Book section involves a question of law, our review of the Appellate Court's determination is plenary"); accord *Commonwealth* v. *Upshur*, 592 Pa. 273, 280, 924 A.2d 642 (2007) ("the determination of whether an item will be considered a public judicial

---

[26] As we previously have noted, the trial court denied the intervenors' motion to vacate the sealing orders with respect to documents submitted to the court for an in camera review, documents protected under certain health care privileges and those portions of the depositions that identified Reverend John Doe I and Reverend John Doe II. The intervenors have not challenged these aspects of the trial court's decision, and they are not at issue in this appeal.

record or document subject to the common law right of access is a question of law, for which the scope of review is plenary").

## A

To evaluate the merits of the defendants' claims, we must determine the extent to which documents filed with the court are presumptively open to the public. We begin our analysis with a discussion of the common-law principles underlying the presumption of public access to court documents.

Public access to court documents traces its roots back centuries through the common law, stemming from the practice of open trials. *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555, 564, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980). In the days before the Norman Conquest, public participation at criminal trials was an inherent part of the court system, as "the freemen of the community, who represented the 'patria,' or the 'country,'" and were required to attend, were responsible for rendering judgment at trial. *Press-Enterprise Co.* v. *Superior Court of California*, 464 U.S. 501, 505, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984). Over the centuries, trials remained open, and those not in attendance could be assured that community standards of justice and procedural norms would be enforced by those present. Id., 507–509.

This tradition of open trials made its way to colonial America and evolved into a presumption of public access to court proceedings and records that remains a fundamental part of our judicial system today. Id., 508; *Nixon* v. *Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978); *In re Oliver*, 333 U.S. 257, 266–68, 68 S. Ct. 499, 92 L. Ed. 682 (1948). The rationale underlying the presumption is straightforward: Public monitoring of the judicial process through open court proceedings and records

enhances confidence in the judicial system by ensuring that justice is administered equitably and in accordance with established procedures. *United States* v. *Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995). "[T]he bright light cast upon the judicial process by public observation diminishes the possibilities for injustice, incompetence, perjury and fraud. Furthermore, the very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness." (Internal quotation marks omitted.) *Leucadia, Inc.* v. *Applied Extrusion Technologies, Inc.*, 998 F.2d 157, 161 (3d Cir. 1993).

This presumption of public access, however, is not absolute. *Nixon* v. *Warner Communications, Inc.*, supra, 435 U.S. 598; *Doe* v. *Connecticut Bar Examining Committee*, 263 Conn. 39, 66, 818 A.2d 14 (2003). When the public's interest in judicial monitoring is outweighed by countervailing considerations, such as certain privacy concerns,[27] or if access is sought for "improper purposes"; *Nixon* v. *Warner Communications, Inc.*, supra, 598; court documents or proceedings may be shielded from public view. *Press-Enterprise Co.* v. *Superior Court*, supra, 464 U.S. 510; see *Doe* v. *Connecticut Bar Examining Committee*, supra, 66; see also *Vargas* v. *Doe*, 96 Conn. App. 399, 406–407, 900 A.2d 525 (2006) (reviewing statutory exceptions allowing closed proceedings), cert. denied, 280 Conn. 923, 908 A.2d 546 (2006).

---

[27] Certain privacy concerns that outweigh the public's interest in judicial monitoring have been codified by statute or in the rules of practice. See, e.g., General Statutes § 46b-49 (private hearings in family-related matters permitted when "in the interests of justice and the persons involved"); General Statutes § 54-76c (court files sealed from public access in certain criminal prosecutions of youthful offenders); General Statutes § 54-86f (in camera hearing concerning evidence of sexual conduct of victim permitted during prosecution for sexual assault); Practice Book § 25-59A (h) (financial affidavits filed in family matters automatically sealed unless financial matters in dispute).

With respect to documents, the presumption of public access never has extended to every document generated in the course of litigation. *Seattle Times Co.* v. *Rhinehart*, 467 U.S. 20, 32–33, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984). For example, raw discovery materials exchanged among parties, but not filed with the court, are not open to the public. Id. Discovery proceedings never were open to the public at common law; id., 33; and the principles supporting liberal discovery are distinct from those supporting public access to court documents. *Anderson* v. *Cryovac, Inc.*, 805 F.2d 1, 12 (1st Cir. 1986); *Mokhiber* v. *Davis*, 537 A.2d 1100, 1109 (D.C. 1988). Parties are obligated to disclose a wide range of information in the course of discovery to support the disposition of their underlying claims. See *Joy* v. *North*, 692 F.2d 880, 893 (2d Cir. 1982), cert. denied sub nom. *Citytrust* v. *Joy*, 460 U.S. 1051, 103 S. Ct. 1498, 75 L. Ed. 2d 930 (1983). Much of this material may be related only tangentially to the ultimate resolution of the issues presented and may have little to no impact on judicial action. *Seattle Times Co.* v. *Rhinehart*, supra, 33; *Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d 110, 125 (2d Cir. 2006); see *United States* v. *Amodeo*, supra, 71 F.3d 1048 (discussing flood of material generated by litigation and its relevance to exercise of judicial power). The principles underlying public access, therefore, are inapplicable to such material, and consequently, unfettered access to discovered material not filed with the court never has been the norm.[28]

[28] In addition, there are countervailing reasons why the presumption of public access should not apply to the fruits of raw discovery. *Seattle Times Co.* v. *Rhinehart*, supra, 467 U.S. 33; *Lugosch* v. *Pyramid Co. of Onondaga*, supra, 435 F.3d 124. Public access to such documents might have unintended adverse effects. Under the threat of public disclosure of all discovery, parties might more vigorously contest discovery requests. "[C]ourts would face intensified protective order litigation in any case potentially of interest to third parties," consuming scarce judicial resources, and in response, courts supervising the discovery process would likely narrow the parties' access to information. *Mokhiber* v. *Davis*, supra, 537 A.2d 1111.

Likewise, not all documents in the court's possession are presumptively open. The presumption of public access applies only to "judicial" documents and records. *Nixon* v. *Warner Communications, Inc.*, supra, 435 U.S. 597; see, e.g., *United States* v. *Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) (noting that public access to judicial documents predates federal constitution and discussing approaches to classifying documents as judicial documents); *Leucadia, Inc.* v. *Applied Extrusion Technologies, Inc.*, supra, 998 F.2d 161 ("[t]he existence of this right . . . [to access judicial documents] is now beyond dispute" [internal quotation marks omitted]); *Anderson* v. *Cryovac, Inc.*, supra, 805 F.2d 13 ("[t]here is a long-standing presumption in the common law that the public may inspect judicial records"); *United States* v. *Martin*, 746 F.2d 964, 968 (3d Cir. 1984) ("[t]he common law right of access is not limited to evidence, but rather encompasses all judicial records and documents" [internal quotation marks omitted]); *Mokhiber* v. *Davis*, supra, 537 A.2d 1108–1109 ("common law right of access . . . does not necessarily apply to all documents that one might arguably term 'court records' relating to a lawsuit" [citation omitted]); *Shenandoah Publishing House, Inc.* v. *Fanning*, 235 Va. 253, 258, 368 S.E.2d 253 (1988) ("a rebuttable presumption of public access applies in civil proceedings to judicial records"). Such documents provide a surrogate to assist the public in monitoring the judicial process when it cannot be present. *United States* v. *Amodeo*, supra, 71 F.3d 1048. Therefore, when determining whether a document should be open to the public, the threshold question under the common law is whether the document constitutes a " 'judicial document.' " *Lugosch* v. *Pyramid Co. of Onondaga*, supra, 435 F.3d 119 ("[b]efore any such common law right [of public access] can attach, however, a court must first conclude that the documents at issue are indeed 'judicial documents' ");

accord *Commonwealth* v. *Upshur*, supra, 592 Pa. 282 ("[N]ot all documents and materials utilized during court proceedings are subject to the right of access. The threshold question in any case involving the common law right of access is whether the documents sought to be disclosed constitute public judicial documents." [Internal quotation marks omitted.]).

Courts have employed three general approaches to determine what constitutes a judicial document. The first approach construes judicial documents narrowly, limited to those documents relied upon to determine a litigant's "*substantive* rights." (Emphasis added.) *Anderson* v. *Cryovac, Inc.*, supra, 805 F.2d 13; accord *Smith* v. *United States District Court*, 956 F.2d 647, 650 (7th Cir. 1992); *Federal Trade Commission* v. *Standard Financial Management Corp.*, 830 F.2d 404, 408–409 (1st Cir. 1987). The rationale for this narrow construction is that, when no substantive rights are affected, there is no judicial action that warrants monitoring. Therefore, the presumption of public access is not triggered.

Courts following this approach have held that financial statements submitted in support of a judge's review of a consent decree; *Federal Trade Commission* v. *Standard Financial Management Corp.*, supra, 830 F.2d 409; a law clerk's memorandum read in open court during the adjudication of a motion to extend time; *Smith* v. *United States District Court*, supra, 956 F.2d 650; and records of hearings and evidence introduced in support of a motion to terminate; *In the Matter of Continental Illinois Securities Litigation*, 732 F.2d 1302, 1309 (7th Cir. 1984); are judicial documents because they reasonably could be relied upon by the trial court to reach a determination affecting substantive rights. In contrast, material filed in support of motions concerning discovery disputes has been held by such courts not to be judicial documents because,

in the view of these courts, discovery proceedings do not affect substantive rights, and, therefore, there is no meaningful judicial action to trigger the presumption of public access. *Anderson* v. *Cryovac, Inc.*, supra, 805 F.2d 13–14.

A second approach construes judicial documents more broadly. Under this approach, documents that are filed with the court that reasonably may be relied upon in support of any part of the court's adjudicatory function are judicial documents. *United States* v. *Amodeo*, supra, 44 F.3d 145 ("the item filed must be relevant to the performance of the judicial function and useful in the judicial process"); accord *Mokhiber* v. *Davis*, supra, 537 A.2d 1111–12 (noting that presumption of public access attaches to all material filed with court "germane to a court's ruling" on decisions of "major importance to the administration of justice" [internal quotation marks omitted]); *Associated Press* v. *New Hampshire*, 153 N.H. 120, 134, 888 A.2d 1236 (2005) (examining state constitutional provisions mandating public access to court proceedings and concluding that right "attaches only to those documents that are important and relevant to a determination made by the court in its adjudicatory function"); *Commonwealth* v. *Upshur*, supra, 592 Pa. 282 ("any item that is filed with the court as part of the permanent record of a case and relied on in the course of judicial decision-making will be a public judicial record or document"). Under this approach, documents relevant to *any* judicial determination implicate the policies behind the presumptive right of access, and, thus, the presumption encompasses documents supporting any decisions reached by the judicial authority, not simply those affecting substantive rights.

Courts applying this analysis have construed judicial documents to include ones filed in support of summary judgment motions, regardless of whether the motion has been granted, denied or even adjudicated; *Lugosch*

v. *Pyramid Co. of Onondaga*, supra, 435 F.3d 121; status reports filed by court officers in connection with a court-mandated investigation; *United States* v. *Amodeo*, supra, 44 F.3d 146; audio recordings played in open court; *Commonwealth* v. *Upshur*, supra, 592 Pa. 287; arrest warrant affidavits filed with a magistrate; *Commonwealth* v. *Upshur*, supra, 282; and financial affidavits filed in connection with cases involving financial matters. *Associated Press* v. *New Hampshire*, supra, 153 N.H. 134. Indeed, even materials filed in support of discovery motions have been held to be judicial documents. *Mokhiber* v. *Davis*, supra, 537 A.2d 1111. In *Mokhiber*, the Court of Appeals for the District of Columbia noted that, because discovery motions have a significant impact on the eventual resolution of disputes, the public has an interest in monitoring such proceedings. Id., 1112. Although the court recognized that a party might prefer to keep discovered material private, it reasoned that, "[b]y submitting pleadings and motions to the court for decision, one enters the public arena of courtroom proceedings and exposes oneself, as well as the opposing party, to the risk, though by no means the certainty, of public scrutiny." Id.

In what arguably could be deemed a third approach, courts have provided the definition of judicial documents in the broadest possible language, stating that the act of filing a document with the court in connection with a pending matter renders it a judicial document. See, e.g., *Leucadia, Inc.* v. *Applied Extrusion Technologies, Inc.*, supra, 998 F.2d 161–62 ("the filing of a document gives rise to a presumptive right of public access"); accord *San Jose Mercury News, Inc.* v. *United States District Court*, 187 F.3d 1096, 1102 (9th Cir. 1999) (holding that there is presumptive right of access to pretrial documents filed in civil cases and those filed prior to judgment in criminal cases); *United States* v. *Martin*, supra, 746 F.2d 968 (holding that judicial records and

documents include "transcripts, evidence, pleadings, and other materials *submitted by* litigants" [emphasis added; internal quotation marks omitted]); *Shenandoah Publishing House, Inc.* v. *Fanning,* supra, 235 Va. 257 (noting that judicial records include "the pleadings and any exhibits or motions filed by the parties and all orders entered by the trial court in the judicial proceedings leading to the judgment under review"); *Rufer* v. *Abbott Laboratories,* 154 Wash. 2d 530, 549, 114 P.3d 1182 (2005) (holding that presumption of public access applies to "any records that were filed with the court in anticipation of a court decision"). The stated rationale behind this approach is that the public's interest in judicial monitoring extends not only to whether the judiciary reaches legally sound *results* but also to the entire judicial process itself, which includes "all records the court has considered in making *any* ruling . . . ." (Emphasis in original.) *Rufer* v. *Abbott Laboratories,* supra, 549. Courts using the broad "filing" language, therefore, have held that judicial documents include settlement agreements filed with the court; *Pansy* v. *Stroudsburg,* 23 F.3d 772, 782 (3d Cir. 1994); *Shenendoah Publishing House, Inc.* v. *Fanning,* supra, 260; summary judgment motions and their supporting exhibits; *San Jose Mercury News, Inc.* v. *United States District Court,* supra, 1102; *Leucadia, Inc.* v. *Applied Extrusion Technologies, Inc.,* supra, 164; nondiscovery related pretrial motions, including motions for preliminary injunctions, motions to dismiss and their supporting documents; *Leucadia, Inc.* v. *Applied Extrusion Technologies, Inc.,* supra, 164; and deposition transcripts attached to motions. *Rufer* v. *Abbott Laboratories,* supra, 541.

Despite employing this broad language, however, these jurisdictions have interpreted the language more narrowly than might be expected. The Court of Appeals for the Third Circuit precluded public access to discov-

ery materials filed in support of discovery related motions. *Leucadia, Inc.* v. *Applied Extrusion Technologies, Inc.*, supra, 998 F.2d 163–64. The Third Circuit reasoned that, because unfiled raw discovery material is not presumptively open to the public; *Seattle Times Co.* v. *Rhinehart*, supra, 467 U.S. 32–33; it would be improper to transform such material into public information merely by virtue of it being attached to a motion concerning discovery. Id., 33. Another court has denied access to depositions that were filed with the court but not used at trial or attached in support of any motion, reasoning that information that is not actually used in the judicial process does not enhance the public's interest in judicial monitoring. *Rufer* v. *Abbott Laboratories*, supra, 154 Wash. 2d 541, 550–51.

Regardless of approach, however, it is clear that the common-law presumption of public access to documents in the court's possession is grounded in the public's interest in monitoring the judicial process. Such access enhances public confidence that the judicial system is operating fairly, impartially and in accordance with established norms. This presumption is not absolute and applies only to "judicial documents" because such documents serve as a proxy for public monitoring of court proceedings when the public cannot be present. While courts have employed various approaches to determine what constitutes a judicial document, the clear trend has been toward greater, but not unfettered, access to documents filed with the court in connection with a court proceeding. Although a minority of courts apply a common-law rule limiting judicial documents to those connected with decisions affecting substantive rights, the vast majority of courts examines whether the document filed reasonably may be relied upon in support of the adjudicatory process, regardless of whether the decision is a dispositive one. With these principles in mind, we turn to the common law in Con-

necticut and the rules of practice, as they apply to the issues in this appeal.

B

Although this court has not had occasion to consider this issue substantively, in *Rosado*, this court recognized certain general principles. "[The] supervisory role of the court in relation to its own files is an especially important one insofar as it pertains to files that contain judicial documents—that is, documents that have been submitted to the court for its review in the discharge of the court's adjudicatory function—because [t]he public has a common law presumptive right of access to [such] documents . . . and likely a constitutional one as well." (Internal quotation marks omitted.) *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 276 Conn. 216–17. We further explained: "As to the issue of what documents are judicial documents, we agree generally that the mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access. . . . [T]he item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document. *United States* v. *Amodeo*, supra, 44 F.3d 145. Whatever the precise parameters of that category of documents may be, however, we also agree that the presumptive right to public observation is at its apogee when asserted with respect to documents relating to matters that directly affect an adjudication. *Gambale* v. *Deutsche Bank AG*, [377 F.3d 133, 140 (2d Cir. 2004)], quoting *United States* v. *Amodeo*, [supra, 71 F.3d 1049]." (Internal quotation marks omitted.) *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 217 n.54. This discussion, albeit dicta in that case, suggests that Connecticut employs the broader approach followed by the majority of jurisdictions. See also *Clerk of the Superior Court* v. *Freedom of Information Commis-*

*sion,* 278 Conn. 28, 53, 895 A.2d 743 (2006) (*Palmer, J.,* concurring) ("[the plaintiff] has a presumptive right of access to . . . all . . . documents in the possession of the court *that relate to its adjudicative function"* [emphasis added]).

In *Rosado,* however, we did not state expressly whether we were discussing the common law or the rules of practice. Practice Book § 11-20A (a) provides that, "[e]xcept as otherwise provided by law, there shall be a presumption that documents filed with the court shall be available to the public." For the reasons that follow, it is clear that the rules of practice codify the common-law presumption of public access such that the language "filed with the court" signifies judicial documents.

It has long been understood that Practice Book provisions are not intended to enlarge or abrogate substantive rights. See General Statutes § 51-14 (a) (noting that rules of practice and procedure "shall not abridge, enlarge or modify any substantive right or the jurisdiction of any of the courts"); *In re Samantha C.,* 268 Conn. 614, 639, 847 A.2d 883 (2004) ("we are obliged to interpret [the rules of practice] so as not to create a new right, but rather to delineate whatever rights may have existed, statutorily or otherwise, at the time of the proceedings underlying the present appeal"). Accordingly, this court has interpreted provisions of the Practice Book through the lens of the common law. See, e.g., *State* v. *Blake,* 289 Conn. 586, 588 n.2, 958 A.2d 1236 (2008) (recognizing that Practice Book § 43-10 ·codifies common-law right of allocution); *State* v. *Colon,* 272 Conn. 106, 303–11, 864 A.2d 666 (2004) (examining common-law right of allocution to determine extent of right of allocution provided by Practice Book § 43-10 [3]), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); *Dunham* v. *Dunham,* 217 Conn. 24, 33, 584 A.2d 445 (1991) (stating that common-

law doctrine of plain error is codified in Practice Book § 4185, now § 60-5); *State* v. *DeVivo*, 106 Conn. App. 641, 644 n.4, 942 A.2d 1066 (2008) (noting that Practice Book § 39-26 recognizes common-law grant of jurisdiction rather than creating new jurisdictional avenue).

As we have explained in part II A of this opinion, the common law creates substantive rights of public access to court records. *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 276 Conn. 216–17. At common law, however, this right never has been absolute, nor has it extended to all documents filed with the court. The public does not have a presumption of access to documents that do not bear directly on the courts' adjudicatory functions. See *Seattle Times Co.* v. *Rhinehart*, supra, 467 U.S. 34–35 (rights of those participating in discovery process remain strong, although considerations such as prevention of discovery abuse and protection of legitimate privacy interests may limit exercise of first amendment rights); accord *United States* v. *Amodeo*, supra, 71 F.3d 1049 ("the weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of . . . judicial power [under article three, § 1, of the United States constitution] and the resultant value of such information to those monitoring the federal courts"). Indeed, the 2005 commentary to § 11-20A expressly indicates that certain material is exempted from the presumption of public access, in accordance with, inter alia, the common law. Practice Book (2005) § 11-20A, commentary ("[a]s used in subsection [a] above, the words '[e]xcept as otherwise provided by law' are intended to exempt from the operation of this rule all established procedures for the sealing or ex parte filing, in camera inspection and/or nondisclosure to the public of documents, records and other materials, as required or permitted by statute . . . other rules of practice

*. . . and/or controlling state or federal case law*" [citations omitted; emphasis added]).

In light of this history and the commentary to § 11-20A of the Practice Book, it is clear that this rule was not meant to be read literally. If this court were to interpret the word "filed" literally, Connecticut would apply a broader approach to the presumption of public access than any jurisdiction to have considered this issue. As we explained in part II A of this opinion, even those jurisdictions that state their rule broadly in terms of documents "filed" with the court limit public access to documents connected with the court's adjudicatory function. In light of the absence of any indication to the contrary, the express direction of the commentary and our practice and precedents, we see no reason to adopt such an expansive interpretation. We therefore hold that § 11-20A codifies the common-law presumption of public access to judicial documents only.[29]

Our conclusion that Practice Book § 11-20A codifies the common-law presumption of public access to judicial documents, however, does not end the inquiry. The question remains what constitutes a judicial document.

For the reasons that follow, we conclude that Connecticut follows the broader approach under which any document filed that a court reasonably may rely on in support of its adjudicatory function is a judicial document. First, by use of the term "filed," the rules of practice indicate that the more expansive approach applies. Second, the majority of jurisdictions, and the clear trend of the common law, regardless of whether the courts limit their definition to only those documents "filed" with the court, is to allow access to any docu-

---

[29] In light of our conclusion that Practice Book § 11-20A codifies the common law, we reject the defendants' claim that § 11-20A violates the separation of powers by " 'decree[ing]' substantive law of Connecticut via its rule-making process."

ment related to the court's adjudicatory function. See, e.g., *United States* v. *Amodeo*, supra, 44 F.3d 145; *Leucadia, Inc.* v. *Applied Extrusion Technologies, Inc.*, supra, 998 F.2d 161–62. Indeed, our statements in *Rosado* were consistent with this approach. See *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 276 Conn. 217 n.54 ("[t]he item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document" [internal quotation marks omitted]). Third, the narrower approach does not advance fully the public's interest in monitoring the judicial process, as it sheds light only on those rulings that directly affect the disposition of a case but shields numerous decisions that incrementally and indirectly may be outcome determinative.

Although we recognize that, among the courts following the majority rule, there is a split as to whether discovery related motions and their associated exhibits should be considered judicial documents, we agree with the Court of Appeals for the District of Columbia that discovery proceedings can have a significant impact on the eventual resolution of disputes. *Mokhiber* v. *Davis*, supra, 537 A.2d 1112. Because of their impact on the judicial process, the public interest in judicial monitoring extends to such motions. The actions of the court during the pretrial period ultimately shape issues between the parties at trial or settlement, and the public surely has a vested interest in ensuring that those actions are carried out equitably, free from corruption or error. The vindication of this interest supports public access, not only to the proceedings themselves, but to any materials upon which a court may rely in reaching a decision. Accordingly, we hold that judicial documents are those filed with a court upon which the court reasonably could rely in the performance of its adjudica-

tory function, including discovery related motions and their associated exhibits.

We recognize that this broad definition of judicial documents creates the potential for parties to harass others by attaching private material with little to no relevance to the issues to underlying motions, thus rendering that material public. But we do not presume bad faith on the part of litigants or their attorneys. See Rules of Professional Conduct 3.1 through 3.6. There are many reasons why a party may introduce material into the court record, not the least of which is the party's responsibility to provide an adequate record for appeal. Practice Book § 61-10;[30] *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 232, 828 A.2d 64 (2003). Instead, we note that there are other avenues open to litigants and courts to control the introduction of material that may be improper, and we encourage those avenues to be taken when appropriate.[31]

---

[30] Practice Book § 61-10 provides in relevant part: "It is the responsibility of the appellant to provide an adequate record for review. . . . For purposes of this section, the term 'record' . . . includes all trial court decisions, documents and exhibits necessary and appropriate for appellate review of any claimed impropriety."

[31] This potential problem can be avoided in large part, if not entirely, by the parties entering into a confidentiality agreement and protective order providing that certain documents will be produced to the opposing party on the understanding that they will only be submitted to a court by way of the lodging process set forth in Practice Book § 7-4C. As set forth, in § 7-4C, a "lodged" record is not considered filed with the court and, therefore, would not be considered a judicial document until such time as the judicial authority grants the motion to seal the record and it is placed in the court file. In the alternative, if the court does not grant the motion to seal, the lodged documents will be returned to the party and, therefore, not be considered a judicial document.

It is also within the authority of the trial court, if it believes it necessary to limit the introduction of certain material, to issue orders to that effect by virtue of both its statutory authority pursuant to General Statutes § 51-14 (a) and its inherent supervisory authority, to "bring about an orderly, expeditious, and just determination of the issues." *In re Appeal of Dattilo*, 136 Conn. 488, 493, 72 A.2d 50 (1950). If those orders are contravened, or if it can be shown that information is included in bad faith, parties or the trial court may seek sanctions. *Stanley* v. *Hartford*, 140 Conn. 643, 648, 103

## C

With these principles in mind, we turn to the trial court's decision in the present case. As we previously have noted, the trial court held, pursuant to Practice Book § 11-20A, that the presumption of public access applies to any document "filed with the court . . . ." (Internal quotation marks omitted.) The trial court rejected the defendants' contention that in *Rosado*, this court had determined that the presumption of public access applies only to judicial documents. It concluded that this court instead had been "referring to the common law and constitutional rights of public access," which the trial court viewed as distinct from the presumption of public access set forth in the rules of practice. The trial court therefore found no need to engage in a review of the judicial document logs that the defendants had submitted, in which they had designated each sealed document in the court file as either a judicial or nonjudicial document and the basis for that characterization.[32]

---

A.2d 147 (1954) ("the court has inherent power to provide for the imposition of reasonable sanctions to compel the observance of its rules").

[32] The judicial documents logs itemized each sealed document and provided the following information: whether the document is a pleading and a description of that document in support of that characterization, the date the document was filed, the Bates number for the document, the docket entry number, if applicable, and the reasons why, in the defendants' view, the document is or is not a judicial document. For example, one entry provided as follows:

"PLEADING: This document is not a pleading. Rather it is a letter pertaining to the [defendants'] motion to obtain oral argument on the plaintiff's objection to the [defendants'] request to revise the complaint dated April 21, 1993.

DATE:      June 15, 1993
BATES NUMBERS:  001792-001793
DOCKET
ENTRY NO.:    N/A
JUDICIAL
DOCUMENT

STATUS: This document is not a judicial document because it is merely a letter to the plaintiff's attorney with a copy sent to the court. This letter is not a dispositive motion on the merits of the case." *Rosado* v. *Bridgeport*

In light of our discussion of the Practice Book's codification of the common law, it is clear that the trial court improperly concluded that the presumption of public access applied to all documents "filed" with the court. Therefore, it was incumbent upon the trial court to determine first whether the documents in question were judicial documents before concluding that a presumption of public access applied to them.

On appeal, the defendants claim that only documents submitted in connection with dispositive motions on the merits of the case should be considered judicial documents. Even more specifically, they contend that only motions that, when granted, result in an adjudication on the merits are judicial documents. Therefore, in the defendants' view, in accordance with their judicial document logs, summary judgment motions (and their attached exhibits) that were granted are judicial documents, whereas, for example, summary judgment motions (and their attached exhibits) as well as nondispositive pleadings, such as motions in limine or sealed discovery motions, that were denied are not judicial documents.

The intervenors respond that, even if the presumption of public access applies only to judicial documents, the documents in question are judicial documents because they were submitted to the court in connection with a pending matter. Specifically, they claim that *any* motions and their attached exhibits that have been submitted to the court are judicial documents, including, for example, summary judgment motions, whether granted or denied, motions in limine or motions in connection with discovery. Therefore, the intervenors disagree with the defendants' definition of judicial documents.

*Roman Catholic Diocesan Corp.*, Docket No. CV-93-0157085-S, The Bridgeport Roman Catholic Diocesan Corporation's and Related Defendants' Judicial Documents Log (May 16, 2006) pp. 11–12.

Our review of the file has not given us any basis to question the defendants' characterization of the documents within the document logs. Accordingly, we are left with a very lengthy document log to which we properly may apply the legal definition set forth in this opinion because, as we have already stated, the question of what constitutes a judicial document is a question of law, and therefore, our review is plenary. See *PNC Bank, N.A.* v. *Kelepecz*, 289 Conn. 692, 697, 960 A.2d 563 (2008) (application of statute to undisputed facts requires plenary review); *Copas* v. *Commissioner of Correction*, 234 Conn. 139, 152–53, 662 A.2d 718 (1995) (noting that application of law to facts subject to plenary review when facts not in dispute). Accordingly, this court may determine as a matter of law whether the documents are judicial documents.

We have reviewed the logs submitted by the defendants and, applying the standard discussed in part II B of this opinion, it is evident that all of the documents, except for a handful of items, are judicial documents. As we previously have explained, any document filed with the court upon which it reasonably could rely in performing its adjudicatory function is a judicial document subject to the presumption of public access. Therefore, all of the nondispositive motions filed in the present case, such as motions in limine or sealed discovery motions and their attached exhibits, along with all of the dispositive motions filed in the present case, such as summary judgment motions and their attached exhibits, *regardless of whether they were granted or denied*, are judicial documents. Accordingly, we agree with the trial court, albeit applying slightly different reasoning, that the presumption of public access applies to these documents.

Our review of the logs reveals, however, a small number of documents, fifteen to be precise, that were not marked in support of any motion or other determination

of the court and, therefore, could not have been relied upon in the course of adjudicatory action. For example, the judicial documents logs list two deposition transcripts that were not filed in connection with any motion. Such documents clearly are not judicial documents. See *Leucadia, Inc.* v. *Applied Extrusion Technologies, Inc.*, supra, 998 F.2d 163–64; *Rufer* v. *Abbott Laboratories*, supra, 154 Wash. 2d 541, 550–51. We conclude that as a matter of law, these fifteen documents are not judicial documents.[33] Accordingly, these docu-

---

[33] Specifically, we conclude that the following documents, referenced by Bates number, are not judicial documents: (1) the letter from Joseph T. Sweeney to Attorney Douglas P. Mahoney, dated April 28, 1993, Bates No. 001776; (2) the letter from Joseph T. Sweeney to Attorney Cindy L. Robinson, dated June 15, 1993, Bates Nos. 001792 through 001793; (3) the letter from Frank W. Murphy to Donald J. Mastrony, dated February 3, 1995, Bates Nos. 001778 through 001779; (4) the letter from T. Paul Tremont to Hon. Bruce Levin, dated March 3, 1995, Bates No. 001777; (5) the bill from the court reporter for a transcript of the hearing dated July 15, 1996, with the attached transcript, Bates Nos. 001786 (letter) and 001787 through 001789 (transcript); (6) the newspaper article dated August 9, 1996, Bates No. 001794; (7) the letter from Douglas P. Mahoney to Hon. David W. Skolnick, dated August 11, 1998, Bates Nos. 002161 through 002162; (8) volume two of the deposition transcript of Reverend Monsignor William Genuario, dated March 13, 1997, with associated exhibits, not attached to any particular motion, Bates Nos. 005596 through 005805 and 002372 through 002581; (9) volume two of the deposition transcript of Reverend Monsignor William Genuario, dated March 13, 1997, with associated exhibits, not attached to any particular motion, Bates Nos. 005806 through 006015; (10) the defendants' response to the supplemental interrogatories, dated April 16, 1997, Bates Nos. 009440 through 009455; (11) internal court memorandum from Hon. Bruce Levin to Donald J. Mastrony, chief clerk, dated January 8, 1997, Bates No. 006934; (12) the notes by Hon. Bruce Levin from two motions, dated January 8, 1997, Bates No. 006935; (13) the excerpts from the transcript of the deposition of Charles Carr, dated October 5, 1995, not submitted in support of any motion, Bates Nos. 009586 through 009689; (14) the deposition transcript of Bishop Walter Curtis, dated July 31, 1995, not attached to any particular motion, Bates Nos. 002008 through 002096; and (15) internal court memorandum from Hon. Bruce Levin to Donald J. Mastrony, chief clerk, dated January 8, 1997, Bates No. 009312. We note that only these particular documents, as referenced by a Bates number, do not meet the definition of a judicial document. To the extent that copies of these documents may exist in the court file and have been marked in support of motions or otherwise indicate that they support particular adjudicatory action; see, e.g., the deposition

ments are not subject to a presumption of public access, and the trial court's order must be reversed to the extent that it unseals these documents. We note, however, that the trial court's order denying the motion to vacate the sealing order remains intact to the extent that it addresses documents not challenged in this appeal. See footnote 26 of this opinion. Pursuant to the trial court's order, those documents remain under seal.

## D

The defendants cite two reasons why, even if the documents are judicial documents, the presumption of public access does not apply. They claim that the trial court improperly failed to engage in the balancing test followed by the Court of Appeals for the Second Circuit in which privacy interests and other countervailing factors are weighed against the presumption of public access.[34] The defendants cite no controlling authority nor do they offer any persuasive rationale why this test should either be engrafted onto our rules of practice or supersede those rules as defined in the Practice Book. It is axiomatic that courts in Connecticut adjudicating matters of state law are not bound by a test that a federal court must apply. In Connecticut, the rules of practice and procedure are defined in our Practice Book and controlling case law. Accordingly, we reject this claim.[35]

transcript of Bishop Walter Curtis; the designation of these particular documents as nonjudicial documents does not strip any other copies of their status as judicial documents.

[34] In *United States* v. *Amodeo*, supra, 71 F.3d 1044, the Second Circuit set forth standards to be employed when considering whether a judicial document should be sealed from public view. First, the court must determine the weight of the presumption of public access by evaluating the item's role in the judicial process. Id., 1049. Next, the court must balance countervailing considerations, including privacy interests, against that presumption before determining that the item should be unsealed. Id., 1050.

[35] We note that the defendants' claim implicates the question of whether a document that is determined to be "judicial" may be sealed. The issue in the present case, however, concerns whether previously sealed documents should be unsealed, and thus, the Second Circuit's balancing test to deter-

With respect to the defendants' claim that any presumption of public access was terminated by operation of Practice Book §§ 7-10 and 7-21; see footnote 21 of this opinion; after one year had passed from the date of the withdrawal of the underlying cases, we are not persuaded. Section 7-10 permits, but does not mandate, the destruction of files in the court's possession one year after a case has been withdrawn. See Practice Book §§ 7-10 and 7-11 (documents may "be destroyed"); *State* v. *Bletsch*, 281 Conn. 5, 17, 912 A.2d 992 (2007) ("the word may imports permissive conduct" [internal quotation marks omitted]). Section 7-21 expressly imposes a duty on parties to remove any exhibits, briefs, depositions, and memoranda from the court file after the final determination of the case. It is well established that courts possess supervisory authority over documents in their possession. *Nixon* v. *Warner Communications, Inc.*, supra, 435 U.S. 598; *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 276 Conn. 216. While in the court's possession, judicial documents remain part of the court's records and are subject to the presumption of public access pursuant to Practice Book § 11-20A (a). Parties electing to leave documents in the custody of the court after the time when they are authorized to remove them do so at their peril.

The defendants cite *Littlejohn* v. *BIC Corp.*, 851 F.2d 673, 683 (3d Cir. 1988), for the proposition that files that are subject to destruction are not judicial records

mine whether judicial documents should be sealed; see footnote 34 of this opinion; is inapposite. When considering whether a sealing order should be modified to unseal previously sealed documents, the court must engage in the test that we set forth in part IV of this opinion.

Moreover, Practice Book § 11-20A sets forth procedures to be followed when determining whether documents should be placed under seal, and under that section, the trial court is directed explicitly to engage in a balancing test under which a sealing order may be entered only if "necessary to preserve an interest which is determined to override the public's interest in viewing such materials." Practice Book § 11-20A (c).

within the supervisory power of the court. The defendants misconstrue *Littlejohn,* which actually holds that, "absent allegations of fraud or other extraordinary circumstances, trial *exhibits that were restored to their owner* after a case has been completely terminated and which were properly subject to destruction by the clerk of [the] court are no longer judicial records within the supervisory power of the [D]istrict [C]ourt." (Emphasis added; internal quotation marks omitted.) Id. In the present case, the documents remained in the court's possession after being subject to destruction. The documents, therefore, continued to be court records subject to the supervisory authority of the court, and the presumption of public access was not terminated.

## III

The defendants' third claim is that the trial court improperly granted the intervenor's motion to vacate because the documents were subject to various statutory and constitutional[36] privileges, including the clergyman's privilege, as set forth in General Statutes § 52-

[36] In their brief, the defendants briefly mention the state constitution as one basis for their privilege claims. They do not, however, provide any independent analysis of the state constitutional claim, as required under *State* v. *Geisler,* 222 Conn. 672, 684–85, 610 A.2d 1225 (1992). "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim." (Internal quotation marks omitted.) *State* v. *Randolph,* 284 Conn. 328, 375 n.12, 933 A.2d 1158 (2007). Therefore, we limit our review to the federal constitution.

The first amendment to the United States constitution provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." Because we conclude that the trial court properly determined that the defendants waived all privileges other than those addressed in footnote 9 of this opinion, we express no opinion as to whether the first amendment affords any such religious privileges.

146b,[37] and religious privileges provided under the first amendment to the United States constitution. They also claim that, despite the fact that they divulged the documents in question to the plaintiffs in the course of discovery without asserting any privileges at that time, the trial court improperly concluded that they had waived those privileges because they had produced the documents under the protection of a sealing order. The defendants further claim that any disclosure to the plaintiffs was a selective waiver at best. We disagree.

The record reveals the following additional undisputed facts and procedural history. After the sealing order had entered, the defendants disclosed numerous documents to the plaintiffs in the course of discovery, some of which were filed later in court. In its memorandum of decision granting in part the motion to vacate the sealing orders, the trial court analyzed the defendants' claim that most of the documents were protected by various privileges. See footnote 9 of this opinion. The trial court found that it was undisputed that, when the defendants disclosed the documents in discovery, they had not objected to such disclosure and did not assert, inter alia, the clergyman's or other statutorily or constitutionally protected religious privileges. Because the defendants had failed to assert the privileges at the time of disclosure, the trial court concluded that any privileges that might have applied had been waived.

The trial court also rejected the defendants' claim that any waiver that they arguably might have given to the plaintiffs was selective, i.e., to the plaintiffs alone,

---

[37] General Statutes § 52-146b provides: "A clergyman, priest, minister, rabbi or practitioner of any religious denomination accredited by the religious body to which he belongs who is settled in the work of the ministry shall not disclose confidential communications made to him in his professional capacity in any civil or criminal case or proceedings preliminary thereto, or in any legislative or administrative proceeding, unless the person making the confidential communication waives such privilege herein provided."

not to the public generally. It noted that the defendants had not expressly limited their disclosure to the plaintiffs. Thus, as a factual matter, any confidentiality that may have been provided by the privileges was vitiated when the information was disclosed. The trial court rejected as a matter of law the applicability of the doctrine of selective waiver, reasoning that the doctrine is not favored because it would inhibit the truth seeking process and would allow parties to manipulate the judicial process by invoking privileges to protect material that already had been disclosed. Accordingly, the trial court concluded that no privileges protected the documents in question.

As a preliminary matter, we note that, although the question of whether a privilege has been waived ordinarily presents a question of fact reviewed under a clearly erroneous standard, the standard of review is plenary when the trial court has made its determination on the basis of pleadings and other documents, rather than on live testimony. *C. R. Klewin Northeast, LLC* v. *Bridgeport*, 282 Conn. 54, 86–87, 919 A.2d 1002 (2007). In the present case, the factual circumstances are undisputed, and the trial court made its determination on the basis of pleadings or other documents. Therefore, our review is plenary.

Waiver is the "intentional relinquishment or abandonment of a known right or privilege." *Johnson* v. *Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938); *C. R. Klewin Northeast, LLC* v. *Bridgeport*, supra, 282 Conn. 86. As a general rule, both statutory and constitutional rights and privileges may be waived. *New Haven* v. *Local 884, Council 4, AFSCME, AFL-CIO*, 237 Conn. 378, 385, 677 A.2d 1350 (1996). "Waiver is based upon a species of the principle of estoppel and where applicable it will be enforced as the estoppel would be enforced. . . . Estoppel has its roots in equity and stems from the voluntary conduct of a party whereby

he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed . . . . Waiver does not have to be express, but may consist of acts or conduct from which waiver may be implied. . . . In other words, waiver may be inferred from the circumstances if it is reasonable to do so." (Internal quotation marks omitted.) *C. R. Klewin Northeast, LLC* v. *Bridgeport*, supra, 87.

The conduct of the parties may be used to establish waiver. *New Haven* v. *Local 884, Council 4, AFSCME, AFL-CIO*, supra, 237 Conn. 388. It is well established that a party that fails to object timely to the introduction of evidence or fails to assert a privilege in connection with disclosed material is deemed to have waived such objection or privilege and may not subsequently resurrect it to protect that material from subsequent disclosure. See *Waterman* v. *United Caribbean, Inc.*, 215 Conn. 688, 692, 577 A.2d 1047 (1990) (party that fails to object timely waives statutory rights to time limits on judgment); *State* v. *Saia*, 172 Conn. 37, 44, 372 A.2d 144 (1976) (party failing to claim marital privilege during testimony may not subsequently assert privilege to prevent its introduction into evidence); *O'Brien* v. *Superior Court*, 105 Conn. App. 774, 787, 939 A.2d 1223 (2008) ("[I]f the holder of the privilege fails to claim his privilege by objecting to disclosure by himself or another witness when he has an opportunity to do so, he waives his privilege as to communications so disclosed. . . . This result is reached because once the confidence protected has been breached, the privilege has no valid continuing office to perform." [Citation omitted; internal quotation marks omitted.]). Similarly, the voluntary disclosure of confidential or privileged material to a third party, such as an adversary, generally constitutes a waiver of privileges with respect to that material. *Westinghouse Electric Corp.* v. *Philippines*, 951 F.2d 1414, 1418 (3d Cir. 1991) ("by disclosing documents to

the [Securities and Exchange Commission] and to the [Department of Justice], [the plaintiff] waived both the attorney-client privilege and the work-product doctrine with respect to those documents"). When the disclosure is inadvertent, however, some courts have held that privileges may not have been waived. *Harp* v. *King*, 266 Conn. 747, 767, 835 A.2d 953 (2003) (citing different approaches courts have taken to inadvertent disclosure with respect to waiver of attorney-client privilege).

In the present case, it is undisputed that the defendants failed to assert privileges at the time that they disclosed the documents to the plaintiffs.[38] It is also

---

[38] In their brief to this court, the defendants do not claim that the trial court's finding that they did not assert the privileges when they produced the documents was clearly erroneous. We note, however, that in a footnote in their brief, they have asserted that, in their motion for a protective order to bar forced disclosure of confidential information and supporting memorandum of law dated September 14, 1994, they had claimed that the documents were protected by various privileges, including a statutory employment personnel record privilege, a statutory clergyman's privilege and religious privileges under the first amendment.

To the extent that the defendants intend to suggest by this cursory reference that the trial court improperly found that they had not raised claims of privilege at the time that they disclosed the documents, that claim fails for several reasons. First, it is inadequately briefed. See *Taylor* v. *Mucci*, 288 Conn. 379, 392 n.4, 952 A.2d 776 (2008) (declining to review inadequately briefed claim in which appellant had cited only one case and provided only cursory analysis). Second, when explicitly queried by Judge Alander at the hearing on the intervenors' motion to vacate the sealing order and the defendants' motion to impose a new protective order as to whether privileges had been claimed during discovery but material was ordered produced notwithstanding, the defendants stated that they could not answer. Moreover, when the trial court, *Levin, J.*, entered the sealing orders in 1994, the court's memorandum of decision addressed only the employment personnel records privilege. If the defendants had intended to pursue claims of privilege that were not addressed by the trial court, it was their responsibility to move for an articulation to clarify the basis of the trial court's ruling or to ask for a ruling on any overlooked matter. *Grimm* v. *Grimm*, 276 Conn. 377, 388, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006). Therefore, any claim that the defendants had raised privileges in the trial court would be deemed abandoned. *Samperi* v. *Inland Wetlands Agency*, 226 Conn. 579, 586 n.9, 628 A.2d 1286 (1993).

undisputed that the information was produced by the defendants during discovery, either through deposition testimony or documents delivered to the plaintiffs. Because the defendants failed to claim these privileges or rights at the time of disclosure and because the defendants voluntarily disclosed the information to its adversaries in litigation, the defendants cannot now be heard to complain that the information should not be disclosed to others.

To the extent the defendants claim that they did not waive the privileges because they disclosed information with the understanding that it would be sealed, they cite no authority, nor have we uncovered any, to support that proposition. See *Westinghouse Electric Corp.* v. *Philippines*, supra, 951 F.2d 1418 (holding that privileged documents disclosed to third party with understanding they would remain confidential waived privilege with respect to others). It is well established that it is the party's obligation to make timely objections, and the failure to do so will operate to waive those objections. See *State* v. *Saia*, supra, 172 Conn. 44 (party that fails to claim marital privilege during testimony may not subsequently assert privilege to prevent its introduction into evidence).

Furthermore, we reject the defendants' contention that any waiver of privileges operated selectively, allowing the defendants to maintain the privilege with respect to parties other than those to whom disclosure was made. We agree with the trial court's conclusion to the contrary and approve of the reasoning employed by the Court of Appeals for the District of Columbia in rejecting the selective waiver doctrine: "[T]he [party] cannot be permitted to pick and choose among [its] opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own

benefit." *Permian Corp.* v. *United States*, 665 F.2d 1214, 1221 (D.C. Cir. 1981). Indeed, even if we were inclined to adopt this doctrine, we would not do so under circumstances wherein the party had not made such a selective waiver expressly. In the present case, the defendants disclosed material relevant to the underlying cases and ultimately settled those actions. The defendants made no claim of privilege at the time of disclosure, and they cannot now attempt to use the court to protect material that they failed to safeguard on their own. Accordingly, we conclude that the trial court properly determined that the privileges challenged in this court had been waived.[39]

## IV

Finally, we turn to the question of whether the trial court adopted the proper legal standard for determining

[39] To the extent that the defendants claim that the trial court acted improperly by concluding that the clergyman's privilege under § 52-146b had been waived because the privilege belonged to individuals other than the defendants who had not expressly waived their privilege, we disagree. It is well established that we give great deference to a trial court's factual findings, and we will not overturn such findings unless they are clearly erroneous such that they find no evidentiary support in the record. *State* v. *Lawrence*, 282 Conn. 141, 154–55, 920 A.2d 236 (2007). As we already have established, it was undisputed that no privileges had been asserted at the time that the information was disclosed. See footnote 38 of this opinion. The trial court therefore reasonably concluded that the clergyman's privilege had been waived by any defendant to whom the privilege applied on the basis of that failure. To the extent that the defendants claim that individuals other than the defendants were entitled to assert the clergyman's privilege and did not waive it, it was incumbent upon the defendants to establish a foundation to support that claim, including the identity of the purported holder of the privilege, as well as the defendants' standing to make any such assertion. See *State* v. *Rizzo*, 266 Conn. 171, 283, 833 A.2d 363 (2003) (noting that it is defendant's burden to establish foundation to claim privilege and declining to review claim when no foundation had been established). Our review of the record indicates that, both in this court and in the trial court, the defendants made sweeping claims that the clergyman's privilege had not been waived by individual penitents, yet provided no specific support for those claims. There is no evidence in the record that the defendants established any foundation to claim either that such individuals existed or the defendants' standing to assert the privilege.

whether sealing orders should be modified. In accordance with the standard it adopted, the trial court concluded that the sealing orders should be vacated because: (1) the intervenors had met their burden of proving that the initial grounds for the sealing orders no longer existed; and (2) the defendants' countervailing interests, namely, reliance on the sealing orders and pending or potential actions, did not outweigh the public's interest in access to the documents.

On appeal, the defendants claim that: (1) the trial court should have applied the standard adopted by the Court of Appeals for the Second Circuit and some other jurisdictions under which the moving party must establish that "extraordinary circumstances" exist to justify vacating the sealing orders; and (2) the intervenors failed to meet that standard. In the alternative, the defendants contend that this court should adopt the standard for vacating or modifying injunctions and place the burden on the moving party to establish that conditions have changed sufficiently to warrant relief.

In response, the intervenors claim that the trial court applied the proper legal standard because the extraordinary circumstances standard is inapplicable to documents presumptively accessible to the public or to sealing orders unreasonably relied upon. Because we agree that the trial court properly determined the legal standard under which to decide a motion to vacate a protective order, we do not reach the defendants' alternative standard.

We note at the outset that the determination of the appropriate legal standard to apply in deciding a motion to vacate a protective or sealing order is a question of first impression in this state. Our review, therefore, is plenary. *Deschenes* v. *Transco, Inc.*, 288 Conn. 303, 313–14, 953 A.2d 13 (2008); see also *Location Realty, Inc.* v. *Colaccino*, 287 Conn. 706, 717, 949 A.2d 1189

(2008) ("[t]o the extent that we are required to review conclusions of law . . . by the trial court, we engage in plenary review"); *Hartford Courant Co.* v. *Freedom of Information Commission*, 261 Conn. 86, 96–97, 801 A.2d 759 (2002) (noting that plenary review required when determining whether correct legal standard applied).

Courts have adopted various standards to determine whether to vacate or modify a sealing order. The extraordinary circumstances test advocated by the defendants and the dissent is the strictest of these standards and requires that, when a party reasonably has relied on a sealing order, it may not be modified "absent a showing of improvidence in the grant of [the sealing] order or some extraordinary circumstance or compelling need . . . ." *Martindell* v. *International Telephone & Telegraph Corp.*, 594 F.2d 291, 296 (2d Cir. 1979); accord *Phillips* v. *General Motors Corp.*, 289 F.3d 1117, 1124 (9th Cir. 2002); *State* v. *Manners*, 239 S.W.3d 583, 587–88 (Mo. 2007). This test effectively establishes a presumption that information that properly has been sealed should remain sealed, particularly when a party has relied upon the sealing order. *Phillips* v. *General Motors Corp.*, supra, 1124 (holding that when sealing order properly is entered, presumption of access shifts, and party seeking access must demonstrate why access is necessary). Reliance must be reasonable, however, and is not justified for sealing orders that are temporary or limited by their terms. *Securities & Exchange Commission* v. *TheStreet.com*, 273 F.3d 222, 230–31 (2d Cir. 2001).

Other courts that have considered this question, however, have rejected the extraordinary circumstances test in favor of a less stringent, balancing of the interests test. See, e.g., *Pansy* v. *Stroudsburg*, supra, 23 F.3d 790; *Mokhiber* v. *Davis*, supra, 537 A.2d 1116–17; see also *Beckman Industries, Inc.* v. *International Ins. Co.*, 966

F.2d 470, 475–76 (9th Cir. 1992); *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1428 (10th Cir. 1990); *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 790–92 (1st Cir. 1988); *Wilk v. American Medical Assn.*, 635 F.2d 1295, 1299–1301 (7th Cir. 1980).[40] Under this approach, the moving party bears the burden of demonstrating why modification is appropriate, and, upon such a showing, the court balances the interests of the party moving to unseal the information with the countervailing interests presented by the party seeking to keep the information sealed. See, e.g., *Pansy v. Stroudsburg*, supra, 790 ("The party seeking to modify the order of confidentiality must come forward with a reason to modify the order. Once that is done, the court should then balance the interests, including the reliance by the original parties to the order, to determine whether good cause still exists for the order."); *Mokhiber v. Davis*, supra, 1117 (requiring party seeking modification to show why sealing is not justified, then permitting opposing party to demonstrate countervailing interest to keep information sealed, and finally requiring moving party to show that countervailing interest does not outweigh public interest in disclosure). Courts applying this standard have viewed it as more compatible with a presumption of public access than the extraordinary circumstances test because,

---

[40] Many courts that have rejected the extraordinary circumstances test have done so in the context of disputes whereby a litigant seeks information that already has been disclosed in other legal proceedings. These courts have balanced the interests in favor of disclosure, specifically finding that modification is appropriate to avoid duplicative discovery requests and citing judicial economy as a reason to modify protective orders. *Beckman Industries, Inc. v. International Ins. Co.*, supra, 966 F.2d 475–76; *United Nuclear Corp. v. Cranford Ins. Co.*, supra, 905 F.2d 1428; *Public Citizen v. Liggett Group, Inc.*, supra, 858 F.2d 790–92; *Wilk v. American Medical Assn.*, supra, 635 F.2d 1299–1301. Under this approach, unless the party wishing to keep the documents sealed would be prejudiced, the sealing order may be modified at the discretion of the court. *Beckman Industries, Inc. v. International Ins. Co.*, supra, 475–76; *United Nuclear Corp. v. Cranford Ins. Co.*, supra, 1428; *Wilk v. American Medical Assn.*, supra, 1299.

once the moving party has demonstrated sufficient reason to modify the order, the presumption of public access is reasserted as to the documents, favoring disclosure over sealing. *Mokhiber* v. *Davis*, supra, 1117.

We agree with the trial court that the test for modifying the sealing orders advocated by the defendants, the extraordinary circumstances test, is not the proper legal standard. Indeed, in *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 276 Conn. 216–17, we explained why such a stringent standard should not be applied and suggested that a balancing test would be more consistent with our rules of practice. In addressing an argument raised by the dissent in that case, we stated: "[A] party's reasonable reliance on the continued vitality of a protective order is a factor that a court must weigh in deciding whether, under the particular facts and circumstances of the case, to vacate or to modify that order. But the dissent goes much farther, elevating that reliance to an exalted status that almost always will be outcome determinative in favor of the party seeking to block public access to court documents. Indeed, under the dissent's unprecedented view, the public will not even be afforded party status in its effort to obtain documents in the court's possession unless it first can establish an 'extraordinary circumstance' or a 'compelling need' for the sealed materials. In requiring the public to establish a compelling need to overcome the parties' asserted interest in maintaining the secrecy of documents in the court's possession, the dissent improperly skews the analysis and bucks the strong consensus favoring disclosure of such documents in the absence of a need for continued secrecy." Id., 210–11. Moreover, the standard advocated by the defendants would be inapplicable to the circumstances presented in the present case, as the trial court properly concluded that the defendants' reliance on the sealing orders remaining permanent was not reasonable given

that the orders expressly stated that they would be reconsidered no later than at the time of jury selection.

We conclude that the legal standard employed by the trial court to modify the sealing orders was proper. Under this standard, the moving party bears the burden of demonstrating that appropriate grounds exist for modifying sealing orders. These grounds include: the original basis for the sealing orders no longer exists; the sealing orders were granted improvidently; or the interests protected by sealing the information no longer outweigh the public's right to access. This latter ground permits the trial court to consider situations in which the original basis for the sealing orders still exists to some degree but has been altered because of a change in circumstances. Once the moving party has met its burden, the court must balance the countervailing interests, if any, introduced by the party favoring continuation of the sealing orders against the public's interest in access to judicial documents. As we acknowledged in *Rosado*, the countervailing interests include, but are not limited to, any reasonable reliance by the parties on the sealing orders and the countervailing privacy interests. Id.; see also *Beckman Industries, Inc.* v. *International Ins. Co.*, supra, 966 F.2d 475. In sum, the trial court properly concluded, at least with respect to the vast majority of the documents, that the sealing orders should be vacated.

The judgments are reversed in part and the case is remanded with direction to order that the fifteen documents enumerated in footnote 33 of this opinion shall remain sealed; the judgments are affirmed in all other respects.

In this opinion ROGERS, C. J., and PALMER and VERTEFEUILLE, Js., concurred.

SULLIVAN, J., dissenting. I disagree with both the majority's conclusion that the trial judge did not abuse his discretion in denying the defendants'[1] motion requesting that he recuse himself and with its conclusion that the trial court properly granted the intervenors'[2] motions to vacate the sealing orders. Accordingly, I dissent.

I

I first address the defendants' claim that the Honorable Jon M. Alander improperly denied their request that he recuse himself because his dual roles as a member of the judicial branch's public access task force (task force) and as the presiding judge in this case resulted in an actual or apparent conflict. The following facts are relevant to this claim. On May 9, 2006, the judicial branch issued a press release in which it announced that Senior Associate Justice David M. Borden, who was the acting head of the judicial branch, had created the task force, the mission of which was to "make recommendations for the maximum degree of public access to the courts, consistent with the needs of the courts in discharging their core functions . . . ." (Internal quotation marks omitted.) Press Release, Connecticut Judicial Branch, Judicial Branch's Public Access Task Force Schedules May 25 Meeting (May 9, 2006). The task force was comprised of Associate Justice Richard N. Palmer, the chairman, eight additional members of the judiciary, seven members of the news media, including Alaine Griffin, a reporter with the Hartford Courant, and two attorneys.

At the June 26, 2006 annual meeting of the judges of the Superior Court, Justice Borden explained the reasons for the creation of the task force. Remarks of Senior Associate Justice David M. Borden, Annual

---

[1] The defendants are identified in footnote 1 of the majority opinion.

[2] The intervenors are identified in footnote 2 of the majority opinion.

Judges Meeting (June 26, 2006) pp. 2–3. He noted that Governor M. Jodi Rell recently had appointed her own task force to recommend ways to make the judicial system more open. Id., p. 4. He stated that, "in the eyes of the other two branches of government, the press, and the public with whom those entities communicate daily, the judicial system is perceived as broken in that it is not sufficiently open and accessible. In that regard, there are things about the judicial system that need fixing. I assure you that if we don't fix it ourselves, others will be only too willing to do that for us." Id. He stated that, "[u]nless we, as judges, seize the initiative, our opportunity to affect the ongoing debate will be lost, with serious long-term consequences for the [j]udicial [b]ranch, judicial independence, and ultimately, the public interest." Id.

The public concerns over public access to the courts that the task force was intended to address had arisen in part as the result of two recent controversies. First, in June, 2002, the Connecticut Law Tribune published an article revealing that the judicial branch had engaged in a practice of classifying sealed case files as level 1, level 2 and level 3. The level 1 files lacked public docket numbers and party names. The level 2 files were provided with names and docket numbers, but the entire case was sealed. The level 3 files contained individually sealed documents in an otherwise open file. See T. Scheffey, "Settlement Reached In Secret-Files Suit," 32 Conn. L. Trib. No. 25, June 12, 2006, p. 2; see also *Hartford Courant Co.* v. *Pellegrino*, 380 F.3d 83, 87 (2d Cir. 2004).[3]

This revelation resulted in "extensive coverage" of the sealing practice by various newspapers, which, in the words of a newspaper reporter, "touched off a pub-

---

[3] I was a named defendant in *Hartford Courant Co.* v. *Pellegrino*, supra, 380 F.3d 83, in my capacity as Chief Justice of the Supreme Court.

lic outcry . . . ." T. Scheffey, supra, 32 Conn. L. Trib. No. 25, p. 2. In response, the judicial branch abolished the level 1 file system and the Superior Courts were instructed that, in the future, all cases should have docket numbers. Id. These new rules were not retroactive, however, and the Hartford Courant, later joined by the Connecticut Law Tribune, brought an action against the judicial branch in the United States District Court seeking the names, docket numbers and docket sheets of the previously sealed level 1 files and level 2 files. Id.; see also *Hartford Courant Co.* v. *Pellegrino*, 290 F. Sup. 2d 265 (D. Conn. 2003). The judicial branch argued that the action should be dismissed because, among other reasons, issues involving the scope of public access to court documents currently were being litigated in state court in the present case. See *Hartford Courant Co.* v. *Pellegrino*, supra, 290 F. Sup. 2d 270 ("[t]he court . . . believes that a discussion of the issues in the case of *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 77 Conn. App. 690, 825 A.2d 153 [certs. granted, 266 Conn. 906, 907, 832 A.2d 71, 72 (2003)] is merited because the case is central to the arguments of both parties in the present litigation").[4]

On June 6, 2006, the newspapers and the judicial branch settled the federal litigation and stipulated to its dismissal. Under the terms of the settlement agreement, the judicial branch agreed to transfer all level 1 cases to a single Superior Court judge who was to have authority to rule on the merits of any and all motions to obtain access to the records.

Second, the task force was intended to address public concerns that had arisen as the result of this court's May 2, 2006 decision in *Clerk of the Superior Court* v.

[4] The United States Court of Appeals for the Second Circuit ultimately rejected the judicial branch's argument that the resolution of the present case would resolve the issues in the litigation over the sealed files. See *Hartford Courant Co.* v. *Pellegrino*, supra, 380 F.2d 99–100.

*Freedom of Information Commission*, 278 Conn. 28, 42, 895 A.2d 743 (2006), in which we had concluded that only court records "pertaining to budget, personnel, facilities and physical operations of the courts" were subject to the Freedom of Information Act, and that "records created in the course of carrying out the courts' adjudicatory function are categorically exempt from the provisions of the act." Id., 29.

On May 17, 2006, the judicial branch announced that two judges who had been appointed to the task force would not be able to serve and that they would be replaced by Judge Alander and Judge Barry K. Stevens. Press Release, Connecticut Judicial Branch, Update on Justice Borden's Public Access Task Force (May 17, 2006). The Hartford Courant reported that the judges had been replaced after they had informed Justice Borden that "they were caught up in the controversy and ongoing legal battle over the 'super-sealing' of court files." L. Tuohy, "Changes In Court Task Force," Hartford Courant, May 17, 2006, p. B1.

Thereafter, Judge Alander was appointed as the cochairman of the task force's court records committee (committee). Griffin, the reporter for the Hartford Courant, was also appointed to that committee. Judge Alander and Griffin attended six committee meetings together over the course of approximately eight weeks. At its June 6, 2006 meeting, the committee adopted four "guiding principles" regarding public access to court documents. The first two principles were: (1) "All records are presumptively open"; and (2) "Records should be closed to the public only if there is a compelling reason to do so." Those principles were incorporated into the committee's final report to Justice Borden. See Connecticut Judicial Branch, Public Access Task Force, Final Report (September 15, 2006), p. 4-10. The final report also defined "[c]ourt [r]ecord" to include: "(1) Any document, information, or other item

that is collected, received, or maintained by a court or clerk of [the] court in connection with a judicial proceeding"; and "(2) Any index, calendar, docket, register of actions, official record of the proceedings, order, decree, judgment, minute, and any information in a case management system created by or prepared by the court or clerk of the court that is related to a judicial proceeding . . . ." Id., p. 4-12.

Not all members of the judicial branch were pleased with the task force proceedings. A judge of the Superior Court gave a speech at the June 26, 2006 annual judges meeting in which he expressed his concern that the judges had not been consulted about the possible changes in the rules governing public access to court documents; see T. Scheffey, "Judges Feel Left Out Of The Loop," 32 Conn. L. Trib. No. 29, July 3, 2006, p. 1; and complained that the judges had been " 'the least informed regarding proposals that may effectuate the most sweeping changes experienced in the history of the [j]udicial [b]ranch . . . .' " Id., p. 9. The Connecticut Law Tribune reported that the judge's remarks had "implied a danger that [Justice] Borden, through the task force, would attempt to administratively create rule changes and avoid full [r]ules [c]ommittee of the Superior Court oversight and procedure." Id., pp. 1, 9. The judge's remarks were greeted with applause by some of the other judges. Id., p. 9. He ended his speech with the statement, " 'No reprisals, please.' "[5] Id. In response, Justice Borden indicated that he was aware that "some judges fear [they would] face 'possible adverse consequences' if they spoke against making courts more open," but insisted that that was not the case. Id.

---

[5] I emphasize that I take no position as to whether the judge's concern about reprisals was well-founded. I refer to these remarks only to show that an ordinary person reasonably could have the perception that some judges *felt* that they were under undue pressure to accept policies that would maximize public access to judicial records.

With this background in mind, I turn to the principles governing judicial disqualifications. As the majority points out, "canon 3 of the Code of Judicial Conduct requires a judge to disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. The reasonableness standard is an objective one. Thus, the question is not only whether the particular judge is, in fact, impartial but whether a reasonable person would question the judge's impartiality on the basis of all the circumstances. . . . Disqualification is required even when no actual bias has been demonstrated if a judge's impartiality might reasonably be questioned because *the appearance* and the existence of impartiality are both essential elements of a fair exercise of judicial authority. . . . Indeed, prevention of *the appearance* of impropriety is of vital importance to the judiciary and to the judicial process. . . . Members of the judiciary should be acutely aware that any action they take, whether on or off the bench, must be measured against exacting standards of scrutiny to the end that public perception of the integrity of the judiciary will be preserved . . . . There must also be a recognition that any actions undertaken in the public sphere reflect, whether designedly or not, upon the prestige of the judiciary. . . . Judges must assiduously avoid those contacts which might create even *the appearance* of impropriety." (Citations omitted; emphasis added; internal quotation marks omitted.)

In my view, a person of ordinary experience and intelligence reasonably could have the following perception of the foregoing facts.[6] First, the official and publicly stated position of the judicial branch in the federal litigation over the sealed court files was that that case and the present case involved very similar

---

[6] Again, I emphasize that I do not state that these perceptions are accurate. I believe only that the facts reasonably could appear in this light to persons of ordinary experience and intelligence.

issues and the resolution of the present case would shed light on, if not govern, the resolution of the federal case. Thus, the judicial branch regarded the present case as involving the same public concerns and controversies as the federal litigation over the sealed cases. Second, the federal litigation, and the outcry in the press over the sealing of court files that led to and accompanied that litigation, were one reason for the judicial branch's creation of the task force. Third, and most significantly, the express mission of the task force was to maximize public access to court records. Although this maximization of public access was to be limited by the *needs of the courts*, the task force clearly was expected to increase public access to court records and there could be no doubt that at least some private concerns that previously had been considered valid reasons for sealing court files would no longer be deemed sufficient. Fourth, the judicial branch was concerned that, if it did not take steps to maximize public access to court records on its own, public pressure would compel the legislative branch or the executive branch to take those steps for it. Fifth, it appeared that at least some Superior Court judges felt that they were under pressure by the branch itself to adopt or to accept new rules and policies governing public access to court documents that they might not have adopted in the ordinary course of judicial rule making. Sixth, Judge Alander was the chairman of the very committee that was charged with recommending new rules and policies to maximize public access to court records. Finally, Judge Alander served on that committee with Griffin, who was a reporter for the Hartford Courant, which, in turn, is one of the intervenors in the present case. Griffin presumably was chosen to serve on the committee because of the Hartford Courant's institutional interest in increasing access to court files. Although Justice Borden exhorted the members of the task force to adopt

"the vantage point of the public interest,"[7] the Hartford Courant had no ethical or other obligation to consider or to advocate any interests other than its own. Connecticut Judicial Branch, Public Access Task Force, Remarks of Senior Associate Justice David M. Borden for the Opening Meeting (May 25, 2006) p. 6.

In light of these circumstances, I believe that a person of ordinary intelligence and experience would have reason to question Judge Alander's impartiality in the present case.[8] The issues raised in this case were, in the expressed view of the judicial branch, inextricably intertwined with the issues raised in the federal litigation over the sealed cases, and the task force was created in part to address public concerns over the sealing practice.[9] A judge of the Superior Court publicly expressed his view that, as a result of the task force, the judges might be pressured to accept new policies and procedures regarding public access to court records that they would not have adopted in the normal course of rule making. Judge Alander served as the chairman of the very committee that was charged with making the recommendations for these new policies and procedures, and he served on the committee with a representative of one of the intervenors in the present case. Finally, the creation of the task force and Judge Alander's service on it were simultaneous with the pres-

[7] See part I A of the majority opinion.

[8] Again, I have no reason to believe that Judge Alander was actually biased in the present case. I believe only that these circumstances could give rise to a reasonable perception of bias.

[9] The majority understands me to be saying that "there is a public perception that Judge Alander was involved in the controversy of supersealed cases" and claims that this conclusion is the result of a "faulty syllogism . . . ." See footnote 13 of the majority opinion. The syllogism provided by the majority may be faulty, but it is not mine. My point is that the legal issues raised by this case were intertwined with the legal issues in the litigation over the sealed cases, which the task force was intended to address, and, therefore, a reasonable person could have the perception that the policies adopted by the task force could have an affect on this case.

ent litigation. Thus, at the same time that Judge Alander and Griffin were charged with identifying new procedures and policies to maximize public access to court records, consistent with the needs of the judicial system, Judge Alander was charged with determining whether the public should have access to the court records at issue in the present case.[10]

Accordingly, a person of ordinary experience and intelligence reasonably could have the perception that Judge Alander might believe that a decision adverse to the intervenors in the present case would expose the task force to the very same public criticism that it was intended to allay, would expose the judicial branch to the same risk of interference from the executive and legislative branches that the task force was intended to prevent, and would expose Judge Alander himself to criticism by all three branches of government. A person of ordinary experience and intelligence also reasonably could have the perception that the Hartford Courant had access to Judge Alander for the purpose of persuading him of the merits of its position on the issue of maximizing public access to court documents that the defendants in the present case did not have. In my view, that circumstance, in and of itself, was sufficient grounds for disqualification. Finally, a person of ordinary experience and intelligence reasonably could have the perception that, if the defendants in the present case were to challenge policies and procedures that the task force adopted, Judge Alander effectively would be in the position of reviewing his own recommendations.[11] Cf. *United States* v. *Glick*, 946 F.2d 335,

---

[10] Indeed, if these circumstances did not give rise to even the appearance of partiality, it is difficult to understand why two Superior Court judges were determined to be unable to serve on the task force because of their involvement in the controversy over the sealed cases.

[11] Contrary to Judge Alander's suggestion that the task force was recommending only " 'what the policy and law *should be* regarding public access to court records,' " while the issues in the present case concerned " 'what is the *existing* law regarding public access and how does it apply to the

336 (4th Cir. 1991) (judges who were involved in promulgation of sentencing guidelines properly may participate in appeals in *"typical* [g]uidelines cases, unless they involve a serious legal challenge to the [g]uidelines themselves" [emphasis in original; internal quotation marks omitted]). Because I believe that Judge Alander's dual roles as a member of the task force and as the judge in the present case were in apparent conflict, I would conclude that he improperly denied the defendants' request that he recuse himself.

In support of its conclusion to the contrary, the majority states that "service on a commission concerned with

facts of these cases' "; (emphasis in original) see part I A of the majority opinion; it is far from clear that the policies and procedures adopted by the task force could have no affect on this case. Rather, the policies adopted by the task force would be persuasive authority in pending cases. Cf. *Marone* v. *Waterbury*, 244 Conn. 1, 11 n.10, 707 A.2d 725 (1998) ("[i]mplicit in our decisions that have discussed the retroactive application of judgments is the presumption that retroactivity is limited to pending cases"). Indeed, when the federal litigation over the sealed files was settled in June, 2006, an attorney for one of the plaintiff newspapers in that litigation stated: "I'm tremendously pleased that the new leadership of the [j]udicial [b]ranch has recognized the value of resolving this long-standing federal court action and I have every confidence that the matter will be addressed expeditiously by the Superior Court in the new spirit of openness." (Internal quotation marks omitted.) T. Scheffey, supra, 32 Conn. L. Trib. No. 25, p. 2. Moreover, the majority acknowledges that "what constitutes a document subject to the presumption of public access is a question of law that is squarely presented to this court for the first time." If the task force was not intended to formulate official judicial policy on this question, it is difficult to understand what its purpose could have been.

I note that, at the June 13, 2006 meeting of the committee, which both Judge Alander and Griffin attended, there was a discussion of what constitutes a court record subject to public access. Judge Alander "mentioned a [United States Court of Appeals for the Second Circuit] ruling that indicated [that] there is no right of public access to a document filed with the court if the document is not used for adjudication. He indicated that it would be better to keep the rule as broad as possible and handle problems (i.e., filing of scandalous or irrelevant material) by other means so that anything filed with the court is open to public access, whether used for decision-making or not." This is the same standard that Judge Alander ultimately applied in the present case.

improving the legal system and the administration of justice, without more, is not a basis for disqualification, even if the subject matter generally relates to the area of the law at issue in the case at hand." As the majority also recognizes, however, "[a]n inquiry into the disqualification of a judge requires a *sensitive* evaluation of *all* the facts and circumstances in order to determine whether a failure to disqualify the judge was an abuse of sound judicial discretion." (Emphasis added.) None of the cases cited by the majority in support of its conclusion involved a situation where: (1) the case under review was inextricably intertwined with a set of events that the commission was intended to address; (2) the commission was charged with formulating the precise policies and procedures that could be dispositive of the case under review and was under political pressure to adopt policies that would be unfavorable to one of the parties; (3) the judge served on the commission with a representative of one of the parties to the case under review; and (4) all of the judge's service on the commission was simultaneous with the litigation. Thus, the majority fails to follow its own directive to conduct a sensitive evaluation of *all* of the relevant facts and, instead, relies solely on the blanket application of one general principle in support of its conclusion that none of these circumstances could have created even the appearance of impartiality.

The majority also states that a reasonable observer would not believe that Judge Alander disregarded canon 3 (a) (4) of the Code of Judicial Conduct, which prohibits ex parte communications between a judge and a party regarding a proceeding. I agree that it would not be reasonable to conclude that Judge Alander and Griffin discussed this particular litigation during the task force meetings. They undoubtedly did discuss, however, the policies and principles that would govern pub-

lic access to court documents,[12] an issue central to the resolution of the present case, and Griffin undoubtedly was appointed to the task force because of the Hartford Courant's institutional interest in maximizing public access to those records, a general interest that has taken particular form in the present case. The defendants had no comparable opportunity to shape Judge Alander's views on that issue.

Finally, for the reasons explained in part II of this dissenting opinion, I disagree with the majority's conclusion that the question of whether the trial court improperly vacated the sealing orders is a pure question of law. Accordingly, I would conclude that Judge Alander's improper denial of the defendant's motion requesting that he recuse himself requires a remand for an evidentiary hearing on the question of whether the sealing orders should be vacated.

II

I next address the majority's conclusion that the trial court properly granted the intervenors' motion to vacate the sealing orders. I agree with the majority's conclusion that "any document filed that a court reasonably may rely on in support of its adjudicatory function is a judicial document." I also agree that documents that the trial court has relied on in making a decision are judicial documents subject to the presumption of public access regardless of whether the underlying motions were granted or denied. Finally, I agree with the majority that, ordinarily, the trial court should apply a balancing test in determining whether sealing orders should be modified.[13]

---

[12] See footnote 11 of this dissenting opinion.

[13] Because I believe that the trial court applied the wrong standard in determining whether the sealing orders should be vacated, I would not reach the question of whether the defendants waived any claim of privilege when they divulged the documents to the plaintiffs in the underlying cases without raising a claim of privilege.

For the reasons stated in my dissenting opinion in *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 276 Conn. 168, 231–41, 884 A.2d 981 (2005) (*Sullivan, J.*, dissenting), however, I disagree with the majority's conclusion that the trial court properly granted the intervenors' motion to vacate the sealing orders under the circumstances of the present case. As I stated in *Rosado*, "[t]he general rule is that intervention *after an action has been terminated* is highly disfavored and will be granted only in extraordinary cases."[14] (Emphasis added.) Id., 238. I continue to believe that, pursuant to the "judicial policy in favor of judicial economy, the stability of former judgments and finality"; (internal quotation marks omitted) *Lafayette* v. *General Dynamics Corp.*, 255 Conn. 762, 772, 770 A.2d 1 (2001); parties

[14] "See *United States* v. *Associated Milk Producers, Inc.*, 534 F.2d 113, 116 (8th Cir.) ('[t]he general rule is that motions for intervention made *after* entry of final judgment will be granted only upon a strong showing of entitlement and of justification for failure to request intervention sooner' . . . ), cert. denied sub nom. *National Farmers' Organization, Inc.* v. *United States*, 429 U.S. 940, 97 S. Ct. 355, 50 L. Ed. 2d 309 (1976); *Crown Financial Corp.* v. *Winthrop Lawrence Corp.*, 531 F.2d 76, 77 (2d Cir. 1976) (intervention after judgment is unusual and not often granted); *Black* v. *Central Motor Lines, Inc.*, 500 F.2d 407, 408 (4th Cir. 1974) ('[i]ntervention is ancillary and subordinate to a main cause and whenever an action is terminated, for whatever reason, there no longer remains an action in which there can be intervention'); *Abdul-Raheem* v. *Orr*, 672 F. Sup. 1389, 1391 (W.D. Okla. 1986) (when action is terminated, for whatever reason, there no longer remains action in which to intervene); *Mundt* v. *Northwest Explorations, Inc.*, 947 P.2d 827, 830 (Alaska 1997) (motions to intervene made after conclusion of litigation normally are not timely absent showing of justification); *In re One Cessna 206 Aircraft*, 118 Ariz. 399, 402, 577 P.2d 250 (1978), quoting *United States* v. *Associated Milk Producers, Inc.*, supra, 116; *State Employees' Credit Union, Inc.* v. *Gentry*, 75 N.C. App. 260, 264, 330 S.E.2d 645 (1985) (motions to intervene made after judgment has been rendered are disfavored and are granted only after finding of extraordinary and unusual circumstances or upon strong showing of entitlement and justification); *Marteg Corp.* v. *Zoning Board of Review*, 425 A.2d 1240, 1243 (R.I. 1981) (because of potential of prejudice to parties, person seeking to intervene after judgment has especially heavy burden)." (Emphasis in original.) *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 276 Conn. 238 n.8 (*Sullivan, J.*, dissenting).

seeking to intervene in terminated actions must show extraordinary circumstances at the intervention stage.

Even if proof of extraordinary circumstances or compelling need is not required at the intervention stage, however, I would conclude that such proof is required to modify sealing orders in terminated cases. By applying the ordinary balancing test, the majority simply ignores the fact that the present case was settled and withdrawn more than one year before the intervenors sought access to the sealed documents, and it treats the motions to vacate the sealing orders in exactly the same way that it would treat such motions in an active case.[15] Thus, the majority gives no weight at all, at any

---

[15] The majority in *Rosado* concluded that the trial court had jurisdiction to allow the intervention for purposes of modifying the sealing orders because the orders were injunctive in nature and the trial court always has the power to modify an injunction. *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 276 Conn. 213–16. I agree that, when the trial court has granted injunctive relief, the court retains jurisdiction to modify that relief *at the request of a party*. See *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, 260 Conn. 232, 242 n.11, 796 A.2d 1164 (2002). As I explained in my dissenting opinion in *Rosado*, however, that does not mean that the trial court has limitless discretion to grant a postjudgment *motion to intervene* in a case in which the court granted injunctive relief. See *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 240 n.11 (*Sullivan, J.*, dissenting). A fortiori, it does not mean that the court has limitless discretion to grant a postjudgment motion to intervene in a case for purposes of modifying an injunction when doing so would undermine the settled expectations of the parties. Id.

The majority in *Rosado* also concluded that the trial court had not abused its discretion in allowing the intervenors to intervene in the underlying cases even though they had been withdrawn for more than one year because "the trial court's exercise of jurisdiction over the withdrawn cases was limited in scope . . . [and] the court restored the withdrawn cases to the docket solely for the purpose of considering the [intervenors'] claim regarding sealed documents in the court's files. . . . Thus, the court's exercise of jurisdiction over the withdrawn cases did not implicate the substantive rights of the parties to those cases." (Citation omitted.) Id., 223. Thus, the majority simply assumed that the defendants had no substantive interest in the finality of the settlement and withdrawal of the underlying cases or in avoiding being haled back into court to litigate an issue that had not been raised by any of the parties to the underlying cases and that could have been raised by the intervenors at any time during the eight years that the

stage of its analysis, to the judicial policy disfavoring interventions after judgment in the interests of judicial economy, stability of judgments and finality.[16]

Nor does the majority take into account the fact that the news media, including at least two of the intervenors—the Hartford Courant Company and the New York Times Company—reported extensively on the underlying cases from the time that the first action was brought in early January, 1993, through the date that they were settled, that they knew about the sealing orders, and that they never sought to intervene in the cases for the purpose of challenging the sealing orders while the cases were active. This fact belies any suggestion that the intervenors are seeking access to the sealed files in order to "provide the public with a more complete understanding of the judicial system and a better perception of its fairness"; (internal quotation marks

---

cases were active. That assumption was, and continues to be, inconsistent with the judicial policy in favor of judicial economy, the stability of former judgments and finality and with the strong public policy favoring the pretrial resolution of disputes.

[16] Whether the trial court should modify sealing orders later than one year after a case has been terminated, when the files are subject to destruction by the court pursuant to Practice Book § 7-10, is a separate question. I continue to believe that "[t]he mere accident that the documents are in the [trial] court's custody in the present case is not a reason for treating the case differently from a case in which the parties and the court diligently fulfilled their obligations with respect to the documents." *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 276 Conn. 237 n.6 (*Sullivan, J.*, dissenting). I cannot perceive how the intervenors can have a right of access that is dependent on a mere accident of timing. At the very least, the fact that the sealed documents could have been destroyed before the intervenors ever became involved in the litigation should be considered as part of the balancing test. Moreover, the majority's statement that "[p]arties electing to leave documents in the custody of the court after the time when they are authorized to remove them do so at their peril" is inapposite. Although the defendants may have had the right to remove materials that were not judicial documents from the custody of the court, the majority has pointed to no authority for the proposition that they had the right to remove judicial documents that were attached to motions and were part of the official court file.

omitted) see part II A of the majority opinion; which is the primary rationale for the presumption of public access to judicial records.

Moreover, while I believe that the interests of judicial economy, stability of judgments and finality mandate the application of a more stringent standard for the modification of sealing orders in *all* terminated cases, they have even greater force when the parties have settled a case in reliance on the existence of sealing orders. See *Securities & Exchange Commission* v. *TheStreet.com*, 273 F.3d 222, 229 (2d Cir. 2001) (modification should not be granted in absence of compelling need or extraordinary circumstances when protective order has been relied upon); see also *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 239 Conn. 708, 742, 687 A.2d 506 (1997) (discussing "[t]he strong public policy favoring the pretrial resolution of disputes" [internal quotation marks omitted]).[17] In my view, the defendants reasonably could have relied on the existence of the sealing orders when they settled the cases. In addition, I would conclude that, because they have alleged that they in fact relied on the continued viability of the sealing orders, they are entitled to an evidentiary hearing on that question. See *Duplissie* v. *Devino*, 96 Conn. App. 673, 691, 902 A.2d 30 (whether party relied

---

[17] I do not address the question of whether this standard should apply when the parties reasonably have relied on the permanence of the sealing orders and an intervenor seeks modification of the order *prior* to judgment, as in *Securities & Exchange Commission*. Accordingly, the majority's statement that I elevate "reliance to an exalted status that almost always will be outcome determinative in favor of the party seeking to block public access to court documents" is entirely unfounded. (Internal quotation marks omitted.) *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 276 Conn. 210. I conclude only that, when the parties have relied on the permanence of the sealing orders *in disposing of the case*, then "the principle . . . that the integrity of judgments should be protected . . . acts to *limit* the court's power to grant postjudgment intervention for the purpose of modifying a protective order." (Emphasis in original.) Id., 239 n.9 (*Sullivan, J.*, dissenting).

on representation is question of fact), cert. denied, 280 Conn. 916, 908 A.2d 536 (2006).

The trial court's finding that it was not reasonable for the parties to have relied on the protective order because "it was *clear* from the *express* language of [the sealing orders] that [they were] intended to be temporary" is not supported by the evidence. (Emphasis added.) In addition to providing that the sealing orders would be subject to reconsideration no later than jury selection, the sealing orders also provided that "[a]ll . . . documents and transcripts [subject to the sealing orders] which the attorneys representing any of the parties believe in good faith may be entitled to protection from disclosure *after the completion of jury selection*, shall be marked 'CONFIDENTIAL: SUBJECT TO COURT ORDER' and shall be submitted to the court for review and appropriate order before being released from the protection afforded by this order." (Emphasis added.) Thus, the sealing orders had two functions. First, they immediately prohibited disclosure of *any* information and materials obtained through the deposition of the defendants. Second, they recognized that at least some of these materials, which were to be marked " 'CONFIDENTIAL: SUBJECT TO COURT ORDER,' " could be entitled to protection even after jury selection. As the majority recognizes, numerous documents submitted pursuant to the sealing orders were marked with this notation. It is apparent, therefore, that, rather than clearly and expressly providing that the sealing orders were temporary, the sealing orders clearly and expressly provided, at least with respect to the marked documents, that no determination as to their temporal duration had yet been made. Thus, the trial court, *Levin, J.*, clearly recognized that there might be considerations other than ensuring the defendants' right to a fair trial that would justify sealing some of the documents permanently.

Moreover, even if the sealing orders had expressly provided that they were not intended to be permanent, the defendants reasonably could have believed that they would *not* be reconsidered *until* jury selection and they reasonably could have relied on this understanding when they agreed to settle the cases *before* jury selection.[18] Clearly, the defendants had a strong incentive to settle the cases before trial in order to avoid the risk that the sealing orders would be vacated or modified. Indeed, if the sealing orders expressly had provided that they were not subject to modification, that would *undermine* the defendants' argument that they settled the cases in reliance on their understanding that they would not be reconsidered until the time of trial. The majority's decision is inconsistent with the strong public policy favoring pretrial resolution of disputes because parties to future cases will be subject to the risk of such publicity regardless of whether they settle a case and, therefore, they will have a reduced incentive to settle.[19]

[18] The sealing orders provided that the covered materials were not to be disclosed or disseminated to nonparties "[u]ntil further order of the court, which order shall be made not later than the completion of jury selection . . . ." *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 276 Conn. 174. Thus, the parties reasonably could have believed that the sealing orders would not be modified unless disclosure of a document was required in order to try the case. Indeed, if the defendants in the present case could not reasonably rely on the continued existence of the sealing orders, it is difficult to imagine any circumstances that would give rise to a justifiable reliance. As the defendants point out, under the majority's view, *no* protective orders will be permanent because they all will be subject to modification upon a showing of "appropriate grounds," even after the underlying case has been settled and terminated. Thus, parties will never be able to establish justifiable reliance.

[19] I recognize that the court in *Securities & Exchange Commission* v. *TheStreet.com*, supra, 273 F.3d 231, stated that "protective orders that are on their face temporary or limited may not justify reliance by the parties." See also *In re Agent Orange Product Liability Litigation*, 821 F.2d 139, 147 (2d Cir.) (when parties settled case before trial, parties could not have relied on permanence of protective order that applied solely to pretrial stages of litigation), cert. denied sub nom. *Dow Chemical Co.* v. *Ryan*, 484 U.S. 953, 108 S. Ct. 344, 98 L. Ed. 2d 370 (1987). In light of "[t]he strong

Finally, I disagree with the majority that whether the documents contained in the sealed files are judicial documents is a question of law to be resolved by this court in the first instance. Although the definition of "judicial documents" is a legal question, whether a party filed a particular document in support of a motion is a question of fact. As the majority points out, the defendants submitted forty-eight compact discs containing the privilege logs prepared by the defendants and copies of 12,675 pages of sealed documents. Among these materials, the majority identifies fifteen documents that it contends are not judicial documents because they were not filed in support of any motion. I believe that the trial court, and not this court, should answer the factual question of whether a particular document is a judicial document, especially in light of the volume of the documents and the complexity of the underlying cases.

In summary, I believe that the intervenors should have been required to demonstrate that their intervention in the present case was justified by extraordinary circumstances. Even if a showing of extraordinary circumstances was not required at the intervention stage, however, the intervenors should have been required to show extraordinary circumstances or compelling need in order for the trial court to modify the sealing orders, particularly if the defendants relied on the orders in settling the underlying cases. Because the trial court did not apply this standard, I would remand the case to the trial court for an evidentiary hearing. Finally, even if the trial court applied the proper standard for vacating the sealing orders, I would conclude that the trial court, not this court, should determine in the first instance which of the documents contained in the

public policy favoring the pretrial resolution of disputes"; (internal quotation marks omitted) *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, supra, 239 Conn. 742; I disagree with this reasoning.

sealed files are judicial documents. Accordingly, I dissent.